OAKLEY *vs.* ASPINWALL *et al.*

Where a judge is disqualified to sit in a cause by reason of consanguinity to one of the parties, he can not sit even by consent of both the parties; and if he do, the judgment will be vacated.

And the disqualification exists, although the party to whom the judge is related is a mere surety for another, or is fully indemnified against the consequences of the suit.

Accordingly, where, upon an appeal being moved on for argument in this court, one of the judges stated that he was related to the appellant in the sixth degree, and was about to leave the bench, and the counsel for both parties thereupon waived the objection, the respondent's counsel requesting and soliciting the judge to sit, which he did on a suggestion being made that the appellant was indemnified by another person not a party, and therefore had no real interest; *it was held,* that the judgment of reversal rendered in the cause by this court was irregular, and the same was set aside and a reargument ordered on the respondent's motion. BRONSON, Ch. J. JEWETT, J. and HARRIS, J. dissenting.

In every grant of judicial power an exception is implied that the judge shall not sit where he is interested or related to the parties; and this exception it seems

is implied in the provision of the constitution declaring that the court of appeals shall be " composed of eight judges."

Notwithstanding the provision of the constitution declaring that the court of appeals shall be composed of eight judges, it is competent for the legislature to enact that a less number shall constitute a quorum. BRONSON, Ch. J. and JEWETT, J. dissenting.

And where a motion to vacate a judgment and for a reargument was made before seven of the judges, (six constituting a quorum by act of the legislature,) *held* that a concurrence of only *four* was necessary in order to grant the motion. BRONSON, Ch. J. and JEWETT, J. dissenting.

*Hiram P. Hastings,* for the plaintiff, made a motion in March last, to vacate the judgment of reversal which had been rendered in this cause in December last, and that the cause either be re-argued or judgment of affirmance be entered. The grounds on which the motion was made are stated in the opinions delivered by the judges.

*Francis B. Cutting,* for the defendants.

HURLBUT, J. It is suggested by the petition of the respondent, that the decision of this court by which the judgment of the superior court in his favor was reversed and a new trial ordered in this case, was entered through inadvertence, and he prays that both the judgment of this court and the *remittitur* may be vacated, and that the appeal may be reargued. This application is based on several grounds, the most important of which is, that the appeal was argued before seven members of the court, one of whom, Judge Strong, was related to the appellants Aspinwall within the seventh degree, and was therefore disqualified to sit as a judge and to take part in the decision of this cause. That two members of the court voted to affirm the judgment of the court below, and five, including Judge Strong, voted for reversal ; and that without the vote of the latter the judgment would not have been reversed.

It appears that upon the appeal being moved for argument, Judge Strong informed the counsel for both parties of his relation to the Messrs. Aspinwall, the appellants, and that because of it he should decline to sit in the case ; but that the counsel

Oakley *v.* Aspinwall.

consented that he should sit, and that he was particularly urged to it by the counsel for the respondent; that he finally consented to hear the cause upon its being suggested, that the appellants Aspinwall were not parties in interest, and would not suffer by the judgment, as they were indemnified by a Mr. Baker, who had the real interest in the matter in litigation. Under these circumstances the judge retained his seat—but his opinion and vote were adverse to the party whose counsel was mainly instrumental in inducing him to serve, and hence this motion, which is made by the same counsel, who now alledges that he was not authorized by his client to consent in the premises, and that if he were, such consent is not an answer to the present motion.

It is difficult, under the circumstances, to regard this application with favor, since the position in which the court is placed in respect to this cause has been brought about mainly by the officious intermeddling of the counsel for the moving party, with the scruples of a judge who, with a proper sense of duty, promptly declined to sit in the cause. But the unfavorable aspect of the motion in this point of view, must not cause us to overlook the principles upon which it is founded, which are of too great importance in the administration of justice ever to be lost sight of.

The appellants Aspinwall were defendants in the judgment from which this appeal was taken—they were personally liable to pay it, as between them and the respondent, and execution to enforce it might have gone against their property. They may have been indemnified—but that did not exempt them from primary liability on the judgment, and hence did not divest them entirely of interest in the case. They were then parties to the suit, and having such an interest as to give rise to the objection now taken to Judge Strong's participation in the decision of the cause, because of consanguinity to them; and the question is, what effect had such participation upon the judgment pronounced by this court?

The first idea in the administration of justice is that a judge must necessarily be free from all bias and partiality. He can

not be both judge and party, arbiter and advocate in the same cause. Mankind are so agreed in this principle, that any departure from it shocks their common sense and sentiment of justice. It was long ago reported, on the authority of *Holt*, that the mayor of *Hertford* was laid by the heels for sitting in judgment in a cause when he himself was lessor of the plaintiff in ejectment, although he, by the charter, was sole judge of the court. (1 *Salk.* 396.) No information has reached us at this day tending to show that the treatment which the mayor received on this occasion was deemed too severe by his cotemporaries, although his apology, to wit—that he was sole judge of the court—has been held by some modern judges to excuse them for determining upon matters and causes in which their relations were parties or were interested. But it seems to me far better, that causes as to which the sole judge of a court is presumed to be biased in favor of one of the parties should remain undetermined until the legislature should provide an appropriate tribunal for their decision, than that the principle which demands complete impartiality in a judge should ever be violated. The urgency of a particular case is not so much to be regarded as the elevation and honor of courts of justice, whose dignity and purity constitute a main pillar of the state.

Partiality and bias are presumed from the relationship or consanguinity of a judge to the party. This presumption is conclusive and disqualifies the judge. A justice of the peace who was a son-in-law of the plaintiff, insisted on retaining jurisdiction of a cause, notwithstanding it was objected against by the defendant; and the supreme court held that this was of itself evidence that the trial was not fair and impartial, and reversed the judgment. (*Bellows, &c.* v. *Pearson*, 19 *John. R.* 172.) In the case of *The Washington Ins. Co.* v. *Price et al.* (1 *Hopkins' Ch. R.* 1,) Chancellor Sanford declared that it is a maxim of every code in every country that no man should be a judge in his own cause; that it is not left to his discretion or to his sense of decency whether he shall act or not; that when his own rights are in question he has no authority to determine the cause; that so well was this principle understood

that in every court consisting of more judges than one, the judge who is a party in a suit takes no part in the proceedings or decision of the cause, and that he knew of no example of the contrary conduct in this country.

The provisions of our revised statutes on this subject profess to be merely declaratory of universal principles of law, which make no distinction between the case of interest and that of relationship, both operating equally to disqualify a judge. Hence the statute declares, that "no judge of any court can sit as such in any cause to which he is a party or in which he is interested, or in which he would be disqualified from being a juror by reason of consanguinity or affinity to either of the parties." (2 *R. S.* 275 § 2; *Revisers' Notes*, 3 *R. S.* 694.)

After so plain a prohibition, can any thing more be necessary to prevent a judge from retaining his seat in the cases specified? He is first excluded by the moral sense of all mankind; the common law next denies him the right to sit, and then the revisers of our law declared that they intended to embody this universal sentiment in the form of a statutory prohibition, and so they placed this explicit provision before the legislature, who adopted it without alteration and enacted it as the law. The exclusion wrought by it is as complete as is in the nature of the case possible. The judge is removed from the cause and from the bench; or if he will occupy the latter, it must be only as an idle spectator and not as a judge. He can not sit as such. The spirit and language of the law are against it. Having disqualified him from sitting as a judge, the statute further declares that he can neither decide nor take part in the decision of the cause, as to which he is divested of the judicial function. Nor ought he to wait to be put in mind of his disability, but should himself suggest it and withdraw, as the judge with great propriety attempted to do in the present case. He can not sit, says the statute. It is a legal impossibility, and so the courts have held it. (*Edwards* v. *Russell*, 21 *Wend.* 63; *Foot* v. *Morgan*, 1 *Hill*, 654.)

The law applies as well to the members of this court as to any other; or if there be any difference it is rather in favor of its

more stringent application to the judges of a court of last resort, as well, because of its greater dignity and importance as a tribunal of justice, as that there is no mode of redress appointed for the injuries which its biased decisions may occasion. The law and the reasons which uphold it apply to the judges of every court in the state, from the lowest to the highest.

It was however urged at the bar, that although the judge were wanting in authority to sit and take part in the decision of this cause, yet that having done so at the solicitation of the respondent's counsel, such consent warranted the judge in acting, and is an answer to this motion.

But where no jurisdiction exists by law it can not be conferred by consent—especially against the prohibitions of a law, which was not designed merely for the protection of the party to a suit, but for the general interests of justice. (*Low* v. *Rice*, 8 *John.* 409 ; *Clayton* v. *Per Dun*, 13 *id.* 218 ; *Edwards* v. *Russell*, 21 *Wend.* 63 ; 21 *Pick.* 101.) It is the design of the law to maintain the purity and impartiality of the courts, and to ensure for their decisions the respect and confidence of the community. Their judgments become precedents which control the determination of subsequent cases ; and it is important, in that respect, that their decisions should be free from all bias. After securing wisdom and impartiality in their judgments, it is of great importance that the courts should be free from reproach or the suspicion of unfairness. The party may be interested only that his particular suit should be justly determined ; but the state, the community is concerned not only for that, but that the judiciary shall enjoy an elevated rank in the estimation of mankind.

The party who desired it might be permitted to take the hazard of a biased decision, if he alone were to suffer for his folly—but the state can not endure the scandal and reproach which would be visited upon its judiciary in consequence. Although the party consent, he will invariably murmur if he do not gain his cause ; and the very man who induced the judge to act, when he should have forborne, will be the first to arraign his decision as biased and unjust. If we needed an illustration of this, the attitude which the counsel for the moving party in

Oakley *v.* Aspinwall.

this case assumed toward the court, the strain of argument which he addressed to it, and the impression which it was calculated to make upon an audience, are enough to show, that whatever a party may consent to do, the state cannot afford to yield up its judiciary to such attack and criticism as will inevitably follow upon their decisions made in disregard of the prohibitions of the law under consideration.

The constitution of 1846 has been referred to, but so far as I can perceive it is silent on this subject. It declares that there shall be a court of appeals composed of eight judges, but does not define its jurisdiction nor enter into the details of its organization; and in the absence of an express declaration to that effect, it is not to be intended that the framers of the constitution designed to abrogate the great and salutary rule which disqualifies a judge from acting in the cases referred to. There is so much reason and fitness in the rule, that nothing short of a solemn and express declaration of the sovereign will ought to be deemed sufficient to abrogate it. In the absence of such an expression in the constitution, it seems proper to hold that the jurisdiction conferred on the judges of this court in general terms, is subject to an implied exception in favor of the operation of the rule by which they would be excluded from sitting in cases where they may be interested or related to the parties. Such an exception is implied under the most comprehensive grant of jurisdiction by statute; (5 *Coke's R.* 118 *b*; *Wingale's Maxims,* 170 ;) and I perceive no reason why it should not be, under a constitutional grant of power.

The views expressed by Judge Bronson in *Pearce* v. *Delamater,* (1 *Comst.* 1,) in reference to the right of a judge of this court to sit in the review of cases, where he has taken part in the decisions in the court below, do not, I think, necessarily conflict with the doctrine I have endeavored to maintain, as there may be reason to believe that the framers of the new constitution designed to change the law on that subject; and as was said in that case, " there was nothing in the nature of the thing which made it improper for a judge to sit in review upon his own judgments." But the present case is different; the disqual-

ification under consideration exists at common law, and is necessary in order to preserve the moral dignity of courts and the due administration of justice; and since it was not embraced in the former constitution of this state, the silence of the new constitution on the subject can not be urged to show that it was the design to abrogate it.

But it may be said that this court consists of eight judges; that a less number can not constitute it, and therefore from necessity its members must sit in all cases.

The constitution declares that it shall be " composed of eight judges," and omits to provide that a less number may constitute the court. The absence of such customary provision has led some to suppose that the framers of the constitution designed to fix the number of judges inflexibly at eight, although it would be extremely difficult to assign any reason for their having done so. I think it is rather to be presumed that the design was to create an efficient court, one capable in view of the accidents of life, of assembling and conducting business with reasonable facility, and that no unnecessary obstacle was designedly presented in its very constitution, to the convenient discharge of its duties. It is, I think, safe to conclude, that the omission to declare that a less number than eight might constitute the court, was either accidental, or it was designed that the legislature should determine what number should make a quorum. I incline to adopt the latter view, which seems to derive support from section 25 of article 6 of the constitution, which directed that the legislature at its first session after the adoption of the constitution should *provide for the organization of the court.* The constitution did not prepare the court for service. It declared that such a tribunal should exist, provided from what number and class of judges it should be constituted, enjoined upon the legislature the duty of organizing it, and left its jurisdiction and course of procedure to be defined by law.

Legislative action was necessary before the court could be said to exist for any practical purpose. Without this it could not have assembled and given audience to suitors; and it owes its being not more to the constitution than to the act of 1847,

and subsequent statutes which fashioned it and endowed it with form and legal vitality. The constitution called for the court, and presented the materials of which it might be formed, and the legislature, under the express authority of the constitution, organized it. The authority to organize implied a right to ordain whatever was necessary or fit in order to form the court and give it efficient action, without going counter to the constitution, which is silent on the subject of a quorum. The legislature then having before them the material for composing the court, and rejecting none of it, were at liberty, I think, to dispense with the attendance of so many of the judges as in their wisdom might be deemed expedient in order to guard against accident, render the court capable of efficient action, and to avoid the necessity of any judge's sitting when interested or related to a party to a suit. This was the first step to be taken in the act of organization, and most necessary to its success ; and I am inclined to concede to the legislature complete authority over this subject to the extent assumed by the statutes referred to.

It being provided by law that six members of the court shall constitute a quorum, a judge who is interested or related to a party to a suit, can not be required to act from necessity, unless when at least three of the judges may be so circumstanced—a case not likely to occur.

It appearing then that Judge Strong could neither lawfully hear nor take part in the decision of this cause—but that he did both—I am of the opinion that no proper determination has been made upon this appeal—that the judgment thus inadvertently entered, and the remittitur, ought to be vacated, and that the cause ought to be reargued.

BRONSON, Ch. J.   This case came before us by appeal from the superior court of the city of New-York, where Oakley as plaintiff had recovered judgment for a large amount against the defendants as sureties for one Baker. The cause was argued in September, 1849, and at the following December term the judgment was reversed and a new trial ordered, all of the

judges being present, and no one dissenting at the time, from the judgment which was rendered. At the last March term, Mr. Hastings as counsel for the plaintiff, on affidavits and papers which had been served on the attorney for the defendants, made a motion that the entry of judgment be vacated, and that the case either be reargued or a judgment of affirmance be entered. The objection to the judgment rests on the allegation, that there was a division of opinion among the judges, either in their consultation room or somewhere else, out of court—five only concurring in the opinion that the judgment should be reversed ; and that one of the five, who is not now a member of the court, was not competent to sit in judgment for two reasons ; first, that he was out of court some part of the time while the cause was under argument ; and second, he was related in the sixth degree to the defendants John L. and William H. Aspinwall. (2 *R. S.* 275, § 2 ; *Code,* § 14.) On these grounds it is insisted that the judgment of reversal was irregular and void.

It is difficult to determine how much or how little ought to be said about this most extraordinary motion ; but as it has acquired some importance by holding the papers over the term, it may be proper to notice several things involved in the application.

And in the first place, the motion contains an impeachment of one of the judges who sat in this court the last year ; and we are asked, though indirectly, to pass a judgment of condemnation upon him. That I am not prepared to do. This is neither the court which the people have ordained for the trial of impeachments ; nor has the accused party had an opportunity to be heard in his defence. I shall be slow to pronounce a judicial censure upon any of my associates, past or present, until I take my seat in another forum, and all the forms for securing a just judgment have been duly observed.

There is also involved in the motion a censure upon all who were members of the court the last year. The papers show, about as well as they show any thing, that the facts which are supposed to have disqualified one of the judges were known to all the others ; and if they pronounced a judgment of reversal without the concurrence of five competent judges, they acted

contrary to law. I have already declined passing a judicial censure upon others; and it will not, perhaps, be thought unreasonable that I should now decline giving judgment against myself.

But without laying any stress upon these considerations, it is a radical objection to the motion, that the plaintiff seeks to overthrow a judgment rendered by a full court of eight judges, by going behind the public act of the court, and inquiring what took place among the judges when they were in conference in relation to the proper decision. Such a motion suggests many reflections. How is it to be known what the judges said or thought when they were conferring together in private ; and how is it to be ascertained that they remained of the same opinion at the time the judgment was publicly pronounced ? Must they deliberate in presence of witnesses, and be impeached if they give their impressions one way and afterwards act the other way ? Or may the judges be interrogated as to what they said or thought in the conference room, and whether their real sentiments were expressed in the subsequent public act ? When the chief justice declares the judgment of the court in any case, can the counsel poll the judges to ascertain how many concur in the judgment ? Or is it to be presumed, in the absence of any dissent, that all are agreed that the proper judgment has been declared ? Many other thoughts are suggested : but I forbear. The motion is wholly without precedent ; and no one can fail to see that its tendency is to degrade the judges, and bring them into public contempt. I am in no way responsible for the present judicial system ; but while I sit here I am bound to maintain and defend the honor and dignity of the judiciary ; and I shall not knowingly yield to any influence, whatever it may be, which tends in the opposite direction.

The point has been several times decided by the court of errors that a rehearing would not, and could not, be legally granted after a cause had been decided on the merits. (*The People* v. *The Mayor of New-York*, 25 *Wend.* 252 ; *and the cases of Wadsworth* v. *Morris, and Van Kleeck* v. *The Reformed Dutch Church, there cited.*) Chancellor Walworth,

who delivered the opinion of the court in the principal case, thought such a precedent would lead to great abuse in a court where the members were often changed. That remark applies much more strongly to this court, than it did to the court of errors; for here one half of the members, at the least, are changed annually, while in the court of errors the change was not more than one fourth annually. In this very case only one half of the judges who are now sitting upon this motion were members of the court when the case was decided ; and only three of the present judges heard the argument and took part in the decision. It will be seen that the court of errors, in the cases which have been cited, went beyond the question of expediency, and denied the legal power to grant such a motion. It is true that those cases are not directly in point; and it must be admitted that no such case can be found; but it is for the reason that this is the first time that any one has ever attempted to go behind the public act of the court, and impeach its judgment by inquiring what was said or done among the judges out of court.

Should it, however, be granted that such a thing may be done, the next answer to the motion is, that the alledged facts on which it is founded have not been proved. No legal evidence has been furnished that there was any difference of opinion among the judges, either in or out of court; nor is there any legal proof that the impeached judge took part in making the decision. The plaintiff says he has been informed and believes that only five judges voted for the reversal, and that the disqualified judge was one of the number. And the counsel tells us, in his affidavit, that he was " busy for near a month in finding out who had voted, and on what grounds ;" that he went to Albany, and " there learned, from an entry in a small book kept by the presiding judge, [meaning, I presume, the chief justice,] the names of those who had voted to reverse the judgment ;" whose names, five in number, are then given : and he was informed of certain other things, which he believes to be true, all tending to show that only five judges concurred in the reversal—the disqualified judge being one of the number. It is

a sufficient answer to this, that mere information and belief is not legal evidence : it proves nothing. How the counsel came by the "small book" is not stated, nor is it important to inquire ; for what he learned from the book is no better than the hearsay evidence.

.Although, as a general rule, information and belief is not legal evidence, it may under certain circumstances furnish sufficient ground for granting a motion. If, for example, the moving papers state upon information and belief the existence of a fact, the truth or falsity of which lies in the knowledge of the party who is to answer, and he gives no answer, there is then reasonable ground for presuming the existence of the fact., But that rule can have no application in this case, for the obvious reason that neither the defendants nor their attorney, on whom the papers for the motion were served, can be supposed to know what took place among the judges when they were advising by themselves, out of court, concerning the judgment which should be rendered. We have no right to presume that they laid their ears to the key hole, or attempted in any other way to pry into the minds of the judges when they were in conference upon the case. And it will not, I suppose, be expected that the judges will leave the bench, and make affidavits in answer to the information and belief of the plaintiff or his counsel. When they consent to do such an act, they will merit the contempt which they will be sure to receive.

I repeat, therefore, there is no legal evidence on the points which have been mentioned ; and I shall make no presumption for the purpose of impeaching either the judge or the judgment.

Enough has been said to dispose of the motion ; but it is due to the judge whose acts have been called in question, if not to the counsel who made the motion, that I should go a little further. And now I will assume, what has not been proved, that the judge did take part in the decision of the cause, and that there would not have been five voices for the reversal without him.

The first ground of impeachment is, that the judge did not

Oakley *v.* Aspinwall.

hear the whole of the argument—having been out of court the whole or the greater part of one of the three sittings which were occupied with the discussions at the bar. For the purpose of making out this allegation the counsel has not only given his own recollection and belief, but he has got a letter from the deputy clerk, who knows nothing about the matter, and affidavits from two or three gentlemen who were attending the court at the time, tending to show that the judge was out of court during the forenoon sitting of Saturday. It seems also that the judge has been applied to on this subject, and that he has written a letter to the plaintiff's counsel, saying, in substance, that he was out of court for a brief period, or a small part of the forenoon sitting on the second day of the argument [Saturday] in consequence of illness; and, as he learned from one of his associates, nothing material was said in his absence, except in reference to a supposed defect in the record, of which the court took no notice in giving judgment. The affidavit of the counsel for the defendants goes to show, that the judge was out of court for only a small part of the forenoon sitting on Saturday. But whether it was half an hour or half a day, it was for the judge to consider whether he had heard enough of the argument to make it proper for him to take part in the decision; and no one else has the right to meddle with that question. I can not but feel abased at finding it necessary to state that such a matter has been brought before the court. If any countenance should be given to this experiment, we may expect to have spies set over us to watch our going out and coming in; and the judiciary will soon be too deeply degraded to be any longer a useful branch of the government. When the judges cease to be respected, there will be an end to the successful administration of justice.

The remaining ground of impeachment is, that the judge was second cousin to the Messrs. Aspinwall. If we stop here, the judge could not properly sit in the cause. But I am not prepared to admit that the judgment would therefore be void. We have been referred to several cases where the judgments and proceedings of inferior courts and officers, exercising special

and limited powers, have been held void on account of the interest of the judge or officer in the subject of the suit, or his relationship to one of the parties. But no authority has been produced, nor have I met with any, which holds that doctrine in relation to a court of superior and general jurisdiction. It is well known that one whose name and memory we all venerate sat in our court of chancery when his relative within the forbidden degrees was a party to the suit ; and the same thing was done by the late chancellor ; (*see* 2 *Barb. Ch. R.* 39 ;) and yet no one ever thought that the decrees which they made were void. Those are much stronger cases than this ; for there the chancellor sat alone ; while here, the judge was only one among eight members of a court, which clearly had jurisdiction. I do not pretend to be wiser or more virtuous than those who have gone before me ; and until an authority can be produced for holding the judgment of a court of superior jurisdiction void because one of the several judges was under a personal disqualification, I shall hold such a judgment valid.

But I shall not leave the judge open to the censure which might possibly fall upon him from the partial statement which has thus far been made of the facts. Although the Messrs. Aspinwall were related to the judge in the sixth degree, they were sued as sureties for one Baker ; and they were fully indemnified, by the deposit of money and securities, against all loss or damage in the premises, and had no personal interest whatever in the suit. The objection to the competency of the judge to sit, if it had the least possible force—which I very much doubt —was one of mere form, without one particle of substance in it.

That is not all. If there was the slightest ground for excepting to the competency of the judge, the objection was expressly waived by both parties before the argument came on. The judge was assured that his relatives, though parties to the record, had no interest in the suit ; and the counsel on both sides united in requesting him to sit before he would consent to do so—the request on the part of the plaintiff coming from the very counsellor who has appeared here with affidavits and arguments to impeach the conduct of the judge for yielding to his request. If the

counsel was not estopped by the law of the land from making such a motion, he must allow me to say, that the laws of honor and decency forbid it. But he was estopped by the law of the land. He was not at liberty first to invite a judge to sit—especially one to whom there was no substantial objection—and after taking the chances of having an opinion in his favor, turn round, when he found the opinion to be the other way, and repudiate his own act. The common law loves honesty and fair dealing, and never approves a different course of conduct. In all my experience—and there is no vanity in saying it has not been very small—I have never known a motion granted which had its foundation in a breach of the obligations of good faith.

I hardly need say that the party is concluded by the acts of his counsel.

But we are told that consent will not confer jurisdiction : and that is true when applied to subject matter, or to the case of a party who can not sue or be sued in an inferior court. But nothing is more common than that jurisdiction over the person is acquired by consent, instead of regular process, even in inferior courts. And besides, this is not a question of jurisdiction. That did not belong to any one judge, but to all of them collectively—in other words, to the court; and although one judge may have been subject to exception, it is not denied that the court had jurisdiction. The question then was not one of jurisdiction ; but whether the judge was not subject to a personal disqualification to sit in that particular case. Most clearly such an objection might be waived by the parties. Nothing is more common than for the parties to waive an objection, on the ground of interest or relationship, to a juror, or to agree, when one of the panel becomes sick or is absent, that eleven jurors may render a verdict. No one would think of calling the verdict void in such a case. And if that may be done in relation to a juror, it can not be doubted that it may be done in relation to one of the judges. Whether it is expedient for a judge to sit in such a case is a question for himself ; and there will be no just ground for censure whichever way he may decide. For myself, I have deemed it prudent to refuse to sit where I either had any inter

Oakley *v.* Aspinwall.

est, or was related to one of the parties, although both united in requesting me to act. But I never doubted that I might lawfully act, and pronounce a valid judgment in such a case—even when I was sitting alone, as a judge of the supreme court.

We are referred to the case of *Coffin, executor,* v. *Tracy,* (3 *Caines,* 129,) where a judgment confessed before a justice of the peace was held void. But it was on the ground that an executor could neither sue nor be sued in a justice's court; (*see Way* v. *Cary,* 1 *Caines,* 191;) and not on account of any disqualification in the magistrate. It has been held in Vermont that a judgment confessed before a justice of the peace was void, where the justice owned the demand, and was himself the plaintiff in interest; (*Bates* v. *Thompson,* 2 *Chip.* 96;) and also that a judgment confessed was void where the justice was related to the plaintiff. (*Hill* v. *Wait,* 5 *Verm.* 124.) Now, whether these cases were decided right or not, they are plainly distinguishable from this. They were judgments before inferior magistrates, having only special and limited powers. The jurisdiction, moreover, belonged to a single magistrate, and not to a court of which he was a component part. And finally, there was nothing in either case but the confession of judgment from which to infer a waiver of the objection to the magistrate; and the confession furnished no just ground for inferring a waiver, because there was no proof that the defendant knew of the disqualification of the magistrate at the time of the confession. Here, we have the case of a judge of a superior court; the court itself having unquestioned jurisdiction, and the objection to the judge being expressly waived. There is no color for the argument that the judgment is void; and no right minded man can fail to see, that the judge is entirely free from all just ground of censure.

I have said that there was no precedent for this motion; and that was true when my opinion was prepared. But since that time a motion having some of the same features has been made and denied; (*Mason* v. *Jones, ante, p.* 375;) all of the judges concurring in the decision.

It may be proper to add, that the views which I entertain of

the motion have been fully submitted to the consideration of my associates. Whether those views have been, or can be, successfully answered, will be judged of by others.

Judges JEWETT and HARRIS concurred in opinion that the motion should be denied. Judge TAYLOR, not having heard the argument, gave no opinion.

Judges RUGGLES, GARDINER and PRATT concurred in the opinion delivered by Judge HURLBUT in favor of granting the motion.

In this stage of the case a question arose whether four judges against three could grant a motion. This involved an inquiry whether the court could be held by less than eight judges. The CHIEF JUSTICE and Judge JEWETT dissented also on that question, the former delivering his opinion as follows :

BRONSON, Ch. J. A question has arisen whether this court can be held by less than eight judges. The people have, I think, settled that question too plainly to leave any room for mistake. The words of the constitution are—" There shall be a court of appeals *composed of eight judges,* of whom *four* shall be elected by the electors of the state for eight years, and *four* selected from the class of justices of the supreme court having the shortest time to serve." (*Art.* 6, § 2.) The court—the only court of appeals for which the constitution provides—is by the express terms of the instrument to be " composed of eight judges ;" and this number is in effect repeated, by specifying two classes of four judges each of which the eight shall be composed. There is no such provision, as is usual in such cases, that a smaller number shall constitute a quorum ; and the language is too plain and explicit to leave any thing for construction. If any one affirms that the court may be composed of one, two, six or seven judges, the constitution answers, that it shall be composed of eight.

It is not necessary, however, to lay any stress on the mere

Oakley *v.* Aspinwall.

form of words; for wherever a power or authority is delegated to several persons, without any provision that it may be exercised by a smaller number, they must all join. It is not necessary to add any thing to make the power joint: it is so in its very nature. But it is not several as well as joint, unless made so by express words. The rule that all must join is, however, subject to this qualification: when the thing to be done is matter of public concern, as the holding of a court, if all meet and consult, a majority may decide. But where the thing to be done is for a private purpose, as the making of an award, all must not only meet, but all must concur in the decision. (*Green* v. *Miller*, 6 *John.* 39; *Ex parte Rogers*, 7 *Cowen*, 526, *and note, p.* 530; *McCoy* v. *Curtice*, 9 *Wend.* 17; *Downing* v. *Rugar*, 21 *id.* 178; *Crocker* v. *Crane*, *id.* 211; *Woolsey* v. *Tompkins*, 23 *id.* 324; 7 *Cowen*, 410, *note*; 2 *R. S.* 554, § 26.) It is never sufficient for a majority to meet, although the thing to be done be of a public nature, unless it be so provided in the delegation of authority.

The inconvenience which might follow, and the possible failure of the end to be accomplished if all should be required to attend, has generally led to a provision that the authority, if of a public nature, might be exercised by a majority of the body, or some other number less than the whole. I have examined nearly all of our constitutions, state and national, and in every one which has been examined there is a provision that the majority of the several legislative bodies, or some other number less than the whole, shall be a quorum for doing business. And with the exception now under consideration, whenever provision is made for a court to be composed of a specified number of judges, it is also provided that a majority, or some other number less than the whole, may hold the court. Under the ordinances of 1699 and 1704 establishing our supreme court, any one of the judges might hold the court. And no change was made by the constitution of 1777. It was not until 1821 that the constitution specified the number of judges of which the supreme court should consist, and it was then declared that any one of the three might hold the court. And when the consti-

tution of 1846 provided for a supreme court of thirty-two judges, it was added, that three judges might hold the court for certain purposes, and one judge for certain other purposes. There is also a provision in the present constitution that a less number than the whole may hold the court for the trial of impeachments; and there was a similar provision in relation to that court, and the court for the correction of errors, in the constitutions of 1787 and 1821. These provisions show very plainly the sense of those who have gone before us. Every convention which has ever assembled in this country to form a constitution, including our own convention of 1846, has, I believe, plainly affirmed the principle, that where a power or authority was conferred on a legislative or judicial body composed of a specified number of members, it was necessary to provide that the power might be exercised by a less number, if such was the intention: and if there is any authority for saying that a majority, or any number less than the whole, may act without an express declaration to that effect, it has not fallen under my observation.

The federal constitution provides that the judicial power of the United States shall be vested in one supreme court; but does not specify the number of judges of which the court shall be composed. Of course that matter was left to the decision of congress; and when congress determined by the judiciary act of 1789, that the supreme court should consist of six judges, it was added, that any four of them should be a quorum. (1 *Story's Laws U. S.* 53.) Here we have another recognition of the principle that it is necessary to provide for a quorum in the delegation of judicial power—a principle which has been many times asserted by the wise men of the nation; and which has, I think, never been denied down to the present day.

It has been suggested, and for aught I know such may be the fact, that the convention which framed the present state constitution forgot to make the usual provision in such cases for a quorum of the court of appeals. But what then? If it could be proved that the omission was an oversight on the part of the convention, it would not help the matter. The fact would still remain that the people adopted the instrument as it is; and

Oakley *v.* Aspinwall.

whatever may be its defects, it is still the fundamental law, which no power but the people themselves has the right to amend or alter.

If the framers of the constitution forgot to provide for a quorum of the court of appeals, it is quite clear that neither the legislature nor the court has power to supply the defect: and if the framers of the instrument considered the question and did not provide for a quorum, it is equally clear that they intended all should sit.

The legislature has said that *six* judges of the court of appeals shall be necessary to constitute a quorum; (*Stat.* 1847, *p.* 321, § 6;) but it has been very careful not to say how many more are necessary, or that six shall constitute a quorum. And so long as six are not eight, it is not probable that the legislature ever will say that six judges may compose a court which the constitution declares shall be composed of eight. But should such a law be passed, it will be a palpable violation of the constitution, and the judges will be bound by their oaths of office to declare it void.

We are referred to the 25th section of the article relating to the judiciary, which declares, that "the legislature, at its first session after the adoption of this constitution, shall provide for the organization of the court of appeals," and for bringing causes into it from other courts. This is not a power to form or organize *a* court of appeals, but a power to organize "*the* court of appeals," meaning beyond all room for doubt or question, the "court of appeals composed of eight judges," which had been instituted by the second section, and which is the only court of appeals mentioned in the constitution. The action of the legislature was necessary to set the court in motion. Its terms, place of sitting, and mode of exercising jurisdiction, were to be provided for by law. And it was further necessary to determine which four of the eight justices of the supreme court having the shortest time to serve, should compose part of the court of appeals in each particular year. The power to organize has matter enough to feed upon, without making it nullify the second section, with which it does not conflict in the slightest de-

gree. A power to organize a court, which those who delegated the power have declared shall be composed of eight judges, does not, upon any just rule of interpretation, include an authority to restrict or limit the number of judges. It is a power to do the necessary things to set the court of eight judges in motion ; and nothing more.

If the power to organize includes an authority to reduce the number of judges, then, as the power is without any restriction, the legislature can provide that one judge may hold the court. There is no escape from this conclusion. The people of this state would, I think, be astonished to learn, that they have au-. thorized the legislature to organize a court of last resort composed of one judge.

It is highly probable that inconveniences will result from following the constitution as it is written. But that considera-tion can have no weight with me. It is not for us, but for those who made the instrument to supply its defects. If the legislature or the courts may take that office upon themselves ; or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be worse than useless.

. Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian construc-tions which are resorted to for the purpose of acquiring power— some evil to be avoided, or some good to be attained by push-ing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitu-tions are gradually undermined, and finally overthrown. . My rule has ever been to follow the fundamental law as it is writ-ten, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But, if the legislature or the courts undertake to cure defects by forced and unnatural con-

Oakley *v.* Aspinwall.

structions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.

I am of opinion that the court of appeals must be, as it now is in fact, composed of eight judges—that no smaller number can hold the court; and consequently that it requires the concurrence of more than four judges to grant this or any other motion; and in this opinion my brother JEWETT concurs.

But the other judges, including Judge TAYLOR, were of opinion that the court might be held by less than eight judges; and consequently that a majority of the seven who heard this motion might grant it.

The six judges declined passing upon the question whether the legislature could authorize one judge, or any other number less than a majority, to hold the court.

They also declined passing upon the question whether the meaning, or just force of the constitution is, that the court may be held by a majority of the eight judges. The CHIEF JUDGE said it was necessary to decide that question; for if the meaning of the constitution is, that a majority of the judges may hold the court, the legislature can not say that a greater number shall be necessary to constitute a quorum; nor can they say that a majority of a legal quorum shall not decide. Then, after setting aside the disqualified judge, there were still six judges—a legal quorum—who heard the argument in the principal case, and four—a majority of the quorum—concurred in the judgment of reversal. In this view of the case the judgment stands wholly unimpeached, and the motion should be denied.

But the six judges said it was not necessary to decide that question; and it was thereupon

*Ordered,* That the judgment of reversal rendered in this cause in December last be vacated, and that the cause be re-argued.