REID v. MEDICAL SOCIETY OF ONEIDA COUNTY et al.

(Supreme Court, Special Term, Oneida County. November, 1915.)

1. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION OF MEMBERS—"TRIAL."

A member of a county medical society whose by-laws provide for the expulsion of members after written accusation and investigation thereof by the society is entitled to a fair trial before impartial judges, which need not be a formal court trial, but must be a formal presentation of charges before the proper tribunal, with formal proof presenting at least a colorable case against the member on trial, and providing him a fair opportunity to refute the charges.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.

For other definitions, see Words and Phrases, First and Second Series, Trial.]

2. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION—TRIAL.

It is not a fair trial for the board of censors of a medical society, considering the expulsion of a member, to collect and examine evidence in his absence, and refuse him an opportunity to examine it or to refute it.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.]

3. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION OF MEMBERS—CHARGES—BURDEN OF PROOF.

Where a member of a medical society was accused of unprofessional conduct by securing the publication of articles contrary to the tenets of the society, the burden was upon the accusers to show, at least by colorable evidence, that he procured the publication.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.]

4. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION OF MEMBERS.

Although the court, in an action to compel the reinstatement of a member alleged to have been wrongfully expelled from a medical society, cannot weigh the evidence presented against a member preliminary to his expulsion, it has the power to say whether there was any evidence against him, and, if there was none, to correct the action if contrary to natural justice.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.]

5. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION OF MEMBERS—EVIDENCE.

The expulsion of a member of a medical society for unprofessional conduct could not be sustained, where his evidence, refuting the charges, was not considered, and he was given no opportunity to secure further evidence.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.]

6. PHYSICIANS AND SURGEONS ⬤9—MEDICAL SOCIETIES—EXPULSION OF MEMBERS—TRIAL.

The expulsion of a member of a medical society, after a trial during which influential members of the society stated personal differences with him, and characterized him as a black-hearted scoundrel and liar, could not be sustained, since those who made such remarks had a voice in his expulsion.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬤9.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. PHYSICIANS AND SURGEONS ⬉⟹9—MEDICAL SOCIETIES—STATE AND COUN-TY SOCIETIES.**

The State Medical Society is not a proper defendant in an action for the reinstatement of a member to the county society, which had wrong-fully expelled him, where, by membership in the county organization, he was also a member of the state organization, and the only action taken by the state organization in the expulsion proceedings was to review the decision of the county society.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 13; Dec. Dig. ⬉⟹9.]

Action by William B. Reid against the Medical Society of the County of Oneida and another. Judgment for relief as prayed as to the defendant the Medical Society of the County of Oneida, and action dismissed as against the Medical Society of the state of New York.

See, also, 162 App. Div. 923, 146 N. Y. Supp. 1109.

D. Francis Searle, of Rome (John D. McMahon, of Rome, of coun-sel), for plaintiff.

Lynch, Willis & Titus, of Utica, for defendant Medical Society of Oneida County.

James Taylor Lewis, of New York City, for defendant Medical Society of New York.

ROSS, J. The plaintiff is a physician and surgeon residing in Oneida county, N. Y. The defendant the Medical Society of the Coun-ty of Oneida will be called herein the "County Society," and the de-fendant the Medical Society of the State of New York will be called herein the "State Society."

On June 30, 1909, a paper of which the following is a copy, was served upon the plaintiff.

"Utica, N. Y., June 25, 1909.

"Dr. G. M. Fisher, President Oneida County Medical Society, Utica, N. Y.— Dear sir: I herewith prefer charges of unprofessional conduct against Dr. W. B. Reid of Rome, N. Y., in permitting the appearance of flagrant adver-tising articles, exploiting various surgical procedures on his part, viz.: An article in an advertising magazine called the 'International Magazine of In-dustry' under date March, 1909. An article published in the Utica Sunday Tribune, dated August 2, 1908. One in the Rome Sentinel under date March 26, 1907. One in the New York Sunday American, under date April 18, 1909, and one in the New York World, under date May 30, 1909. In the last-mentioned article the representative of the paper goes on to quote Dr. Reid as follows: 'My own special aim,' et sequentia, making the entire article ap-pear to be authorized by him. I respectfully request that these charges be investigated by the Oneida County Medical Society.

"Yours very truly,  Fred H. Peck.
"J. G. Kilbourn."

Thereafter, pursuant to the by-laws of the County Society, the mat-ter was referred to the board of censors of said society, and on July 12, 1909, plaintiff appeared before said board of censors. The pro-ceedings had will be detailed further on. Thereafter the said board of censors made findings which were presented at a regular meeting of the County Society. The following is a copy of the findings:

"To the President and Members of the Oneida County Medical Society:

"On June 25, 1909, charges of unprofessional conduct were presented to the president of this society by Drs. F. H. Peck and J. G. Kilbourn, against Drs. W. B. Reid, C. C. Reid, J. O. Stranahan and J. E. Groff, of Rome, N. Y. These men were charged with flagrant advertising articles appearing in 'The International Magazine of Industry,' under date of March, 1909. An article in the Utica Sunday Tribune of August 2, 1908. An article in the Rome Sentinel, under date of March 25, 1907. One in the New York Sunday American under date of May 30, 1909. These charges were presented to the board of censors, and investigated. Copies were duly sent to the physicians above named, and a hearing was held on July 12, 1909. The ground was gone over carefully, and the defendants were given an opportunity to present their side of the case. After hearing all the evidence obtainable and making several investigations this board, after careful deliberate judgment, would report to the Oneida County Medical Society that the charges against Drs. W. B. Reid, George Reid, J. O. Stranahan and J. E. Groff are well founded, and would recommend that they be expelled from this society. We would also recommend that the charges against Dr. C. C. Reid be dropped.

"F. J. Douglass, Chairman.
"Earl D. Fuller.
"Herbert G. Jones.
"Charles Bernstein.
"T. H. Farrell."

Said report was thereupon adopted by resolution of the Society, a majority of the members present voting in the affirmative.

It is not necessary to detail the successive steps in this controversy which were thereafter taken from April 10, 1910, to July 14, 1914, except to say that in the meantime the plaintiff appealed from the County Society to the State Society, and that during said period of time, the plaintiff invoked the assistance of this court in obtaining a writ of peremptory mandamus, and also brought an action in this court, which was tried and resulted in a judgment dismissing plaintiff's complaint. The plaintiff appealed therefrom to the Appellate Division. A decision affirming said judgment was had upon the ground that the action was prematurely brought. Finally, on July 14, 1914, the County Society took action for the second time upon the findings of the board of censors of July, 1909, and such proceedings were thereupon had by the County Society that the plaintiff was again expelled from said society, and from such determination or judgment of the County Society plaintiff again appealed to the State Society, pursuant to the provisions contained in the constitution and by-laws of the two above-mentioned societies, and such action was thereupon taken by the said State Society, that it was therein determined' that the action of the County Society was sustained in its decree of expulsion. The plaintiff, having thereby exhausted the remedies given him by the constitution and by-laws of the County Society, seeks further relief in an appeal to a court of equity.

To rightfully understand the situation, reference to the relative rights of the parties will be instructive. The only qualifications for admission required by the by-laws of the County Society were that the applicant be a "physician in good standing, residing in the county of Oneida, * * * and duly licensed and recorded in the county clerk's office of Oneida county. * * *" In this regard, the situation is unlike that of an applicant for membership to a social or

fraternal society, in which case the right to admission may depend upon special qualifications, however capricious, as age, sex, sect, social standing, etc.   Membership in the County Society carries valuable privileges relating to the practice of his profession, both educational and professional, which latter advantages have a potential financial value, and also carry property rights, from which privileges and enjoyment of property rights an expelled member is deprived.   In the case of the People ex rel. Meads v. McDonough, 8 App. Div. 592, 35 N. Y. Supp. 214, 40 N. Y. Supp. 1147, which was a case brought by the relator for restoration to the order of the Knights of Sobriety, Fidelity, and Integrity, the judgment of the trial court, restoring the relator to membership, was affirmed by the Appellate Division on the opinion of Mr. Judge Vann, who tried the case below.   That learned jurist stated as follows (page 596 of 8 App. Div., page 217 of 35 N. Y. Supp.):

"While courts are slow to look into such transactions of private corporations as affect no vested right that may be measured in money, they are prompt to interfere, upon proper application, when by an arbitrary or unlawful exercise of power a member has been deprived of that which costs him and is worth a definite sum of money. * * * Where such serious results follow a deposition from membership, those who allege regularity of procedure in the effort to expel must be held to strict proof, for no presumption will be indulged in to support a forfeiture, which the law abhors."

The plaintiff, having become a member of the County Society, and subscribed to its constitution and by-laws, became bound thereby.   In this connection, it may be stated that Exhibit 1 has been assumed, and was conceded upon the trial, to be the by-laws of the County Society, and will be so assumed.   As stated in the case of the People v. Medical Society of Erie County, 32 N. Y. 185, on page 192:

"They [referring to the regulations contained in the by-laws of the medical society] are not limited in their scope to the range of moral obligation, but embrace express rules of conduct in personal, professional, and public relations.   They are regulations in the various departments of morals and manners, of courtesy and etiquette, of delicacy and honor. * * *"

In the case of Ewald v. Medical Society of the County of New York, 144 App. Div. 82, on page 89, 128 N. Y. Supp. 886, on page 891, the court says:

"It seems plain, therefore, that a member on his admission to the society assumes an obligation, not only to conform to the rules and regulations of the society respecting his immediate relations to it, but as well to observe its standards of professional ethics, and that a breach of that obligation in any respect involves a violation of duty to the society."   Baxter v. McDonnell, 155 N. Y. 101, 49 N. E. 667, 40 L. R. A. 670.

But, as stated in the case of People v. Medical Society of the County of Erie, 24 Barb. 570, on page 575:

"A by-law must not be at variance with the general law of the land.   It must be reasonable, and adapted to the purposes of the corporation.   Kent says these corporate powers of legislation must be exercised reasonably, and in sound discretion, and strictly within the limits of the charter, and in perfect subordination to the Constitution and general law of the land, and the rights dependent thereon. * * *"

I disregard many objections made by the plaintiff's attorney; as, for instance, that the charges against the plaintiff do not state an offense, and that the report of the board of censors was not presented at the next regular meeting of the County Society, as required by the by-laws of said society. I assume that the offense with which the plaintiff was charged was sufficient to justify his expulsion, if proven; and I also assume, as was conceded by counsel for the respective parties upon the trial, that I have nothing to do with the actual truth or falsity of the charges made against the plaintiff, but I am simply to determine whether, in accordance with the constitution and by-laws of the County Society, subordinate to the laws of the state, the plaintiff had a fair trial: that he had notice; that he had a reasonable chance to defend himself from the charges; that proof was presented (not necessarily in accordance with legal form) to establish his guilt; that such proceedings were had before the board of censors, and finally before the full meeting of the County Society, as not to shock our sense of fairness, as stated by then Mr. Judge Vann, in Mead's Case, page 596 of 8 App. Div., page 218 of 35 N. Y. Supp.:

"The relator was entitled to a fair trial, after due notice, before an impartial tribunal, and as the method of procedure was not regulated by the laws of the association, it should be analogous to that observed in ordinary judicial proceedings, so far, at least, as to promote substantial justice."

It is at least questionable whether the County Society had, in fact, delegated, or had the right to delegate, to the Board of Censors, the right to try a member upon charges of misconduct. The following is a copy taken from the provisions of the by-laws relating to this matter (Chapter 4, §§ 7, 8, 9, 11, 13):

"Sec. 7. They shall take cognizance of all charges preferred against a member. Charges against a member shall be presented to the president in writing and by him referred to the censors, who shall meet, examine the same and the evidence thereon.

"Sec. 8. If the majority of the censors shall be of the opinion that the charges are well founded, they shall serve a copy of them upon the accused and call for his attendance at a given date before the censors. Of this meeting the accused shall have at least ten days' notice.

"Sec. 9. After the investigation of the charges, they shall report their findings to the society at its next meeting."

"Sec. 11. Charges brought against a member of the board of censors shall take the course above described, except that the society shall hear evidence and pass judgment."

"Sec. 13. There shall be three (3) degrees of discipline—censure, suspension, and expulsion, which shall be imposed upon members by a majority of the votes cast at a regular or special meeting of the society convened for that purpose."

The foregoing provisions of the by-laws apparently provide for a hearing before the board of censors, and provide that said board shall report its findings to the county society at its next meeting. They also provide that no disciplinary order can be made except by the County Society at a regular meeting, or at a special meeting convened for that purpose. Section 11 provides that, in the case of charges against a member of the board of censors, the same course shall be taken, except that the Society shall hear the evidence, and pass judgment. The in-

ference from this is that in other cases the County Society does not take evidence. In the case of Bryant v. District of Columbia Dental Society, 26 App. Cas. D. C. 461, at page 471, the charges were referred to a special committee to examine into the case, in accordance with the terms of the by-laws of the defendant society, and to report at the next regular meeting, to which the plaintiff made no objection. The charges were mostly based upon letters concededly written by the appellant. Upon the coming in of the report of the committee, a motion was made and seconded that all the evidence of the case be submitted, which motion was denied, and appellant was expelled. Upon this state of facts, Mr. Justice Duell says:

"'Whereupon,' the by-law proceeds, 'if the charge has been sustained, the offending member may, by a vote of two-thirds, be reprimanded or expelled.' Now, I do not believe that that includes the rehearing by the whole society; that it is simply, as the language indicates, a report made by the committee to the society, upon which the society acts either affirmatively or negatively— either accepts it or rejects it—and a member of that society, in determining his conclusions as to that report, would have the right to call for the testimony upon which the committee based its report, or would have the right to question the accuracy of the report, but that is a right which is for the members of the society before they vote upon the report. * * * They have the right, as any legislative body has, to act upon the report of the committee which has been appointed according to the rules of the order, the society, and they can act with or without information. They can vote blindly, if they please, for it, or they can insist on further information; but it is for them to say whether they will accept or reject the report."

In Mead's Case, supra, Mr. Judge Vann seriously questions the power to delegate the right of trial. That learned jurist states (page 597 of 8 App. Div., page 218 of 35 N. Y. Supp.):

"There are respectable authorities which hold that where no mode of procedure for the conduct of a trial is specified, the society may adopt such mode as it pleases, subject only to the limitation that it must be fair, even including a trial by committee (citing cases). I regard such practice as loose and dangerous, and refuse to adopt it in the absence of a controlling authority in this state. It may well be that a corporation may delegate to a committee the power to take the evidence and report it to the members, for them, duly assembled for the purpose, to act upon, but the trial itself, and the decision of the issue, should be by the whole, and not by a small part."

I will assume, however, that the board of censors did have the right to try the charges against the plaintiff.

The board of censors did not return to the County Society with its findings any evidence taken before it, or the name of any witness who appeared before it, and it would seem that the County Society must have acted, so far as the records show, solely upon the findings of the board of censors and what occurred at the meeting when the plaintiff was expelled.

It is now necessary to state what occurred before the board of censors July 12, 1909, and what occurred before the County Society July 14, 1914. I quote from the evidence of the plaintiff in this connection, and it may be stated that, with one exception to which reference will be made, this evidence was, in the main, uncontradicted.

The plaintiff testified, in regard to the proceedings before the board of censors, in substance, as follows: After the chairman of the board

had called the meeting to order, and said that the censors were prepared to hear the matter that was before them, the president, Dr. F. J. Douglass, asked Dr. Peck, one of the physicians who signed the charges prepared against the plaintiff, if he had anything to say or any evidence to offer, and Dr. Peck said he had no evidence to offer to sustain the charges, other than the publications themselves. Sten. Min. p. 11. Dr. Peck then submitted two newspapers, the New York American and the Magazine of Industry, containing the articles that were complained of, and these were handed up to the chairman, Dr. Douglass.

"The chairman then asked me if I had anything to say, and I replied that I had; that I was there to answer the charges, and that I was not guilty of allowing those articles to appear. Page 12. * * * I also stated to the chairman that I was prepared to meet any evidence that they might have to offer, and inasmuch as they had not offered any evidence, I would like to state that I was not guilty; and, while I did not consider it my moral or my legal obligation to offer any evidence, and while I had not much experience in such matters, I understood that a man was considered, in the ordinary intercourse of men, to be innocent until he was proven guilty; that nevertheless, as I respected the opinion of the board of censors and the members of the County Medical Society, I would like if they would allow me to submit evidence supporting my statement that I was not guilty of the charges, so I did offer letters which had been written by me, and answers which were received from the different publishers of the periodicals about which complaint had been made. I presented them all, but was not allowed to read but two or three."

Dr. Fred J. Douglass, a witness sworn on this trial by the defendant, the County Society, denied that Dr. H. G. Jones, the secretary of the board of censors, stated to the plaintiff that he need not read any more of these letters.

"I repeated the statement that I was not guilty; that I had not allowed any of these things to appear, and made the statement as to my theory of where the pictures which were used in the articles in question were obtained, and explained that some of the illustrations in one of the New York papers were illustrations of people and doctors that I had never seen or heard of, and that they were illustrations of instruments that I had never heard of and never used. * * * He [the secretary] interrupted me, when I was offering some explanation in regard to these things, and said that nobody but a fool would believe that stuff; that any one that could read those articles could see on the face of them that they must have been written by me or published by me—something to that effect, I do not remember the exact words—that further on in the hearing I asked Dr. Peck what proof he had that I had allowed, if that was the charge, that I had allowed flagrant advertising matter to appear. I asked specifically what proof he had that I had allowed it. He said he had none."

The board then went into executive session, and the plaintiff retired. S. M. p. 16. He never was notified as to any other or further hearing, or the taking of any further evidence in the matter (page 17), and he never heard of any statement of any witness, other than the proceedings before the board of censors (S. M. p. 17).

The following is the substance of the plaintiff's testimony as to the proceedings before the Oneida County Medical Society, July 14, 1914, when he was formally expelled: After the board was organized, and it was stated by the chairman that the first business on the program

was to take up the request of the State Medical Society regarding the report of the board of censors, and a motion was made that the report of the board of censors be adopted, he stated that he objected to the report of the board of censors which recommended his expulsion, because it was unfair and unjust; that no evidence had been offered at the hearing of the board of censors proving the charges; that no evidence had been submitted or reported to the Society on which the members could base an opinion regarding the matter (S. M. p. 25), and then explained at length the injurious effect of his expulsion. One of the physicians, Dr. G——, then took the floor and addressed the meeting, in substance:

"That he was called out of bed one night by a local physician, and requested to see a case in consultation; that he did see it, and subsequently he had been sued for malpractice; that such suit was brought, and he had to defend it, making the general insinuation that I, or some of the persons against whom charges had been brought, had had something to do with the action that was brought against him. That was the general drift of his remarks. I objected to those remarks at the time because they were not in relation to the charges that had been brought before the censors, and Dr. Hart [the presiding officer] stated that I was out of order." S. M. p. 27.

"Dr. F—— then took the floor, and stated, with other things, that he was personally interested, and interested as a member of the board of censors, and that it was the duty of the Society to sustain their board of censors in their action, and he believed that we should be expelled." S. M. p. 28.

Then the secretary of the board of censors took the floor, and stated, with other things:

"That he had personal feeling regarding the matter, that I had attacked him, and that I was a black-hearted scoundrel and unfit to be a member of that Society; that I was a liar, and he would not believe me under oath, and he thought it was the duty of the Society to sustain the board of censors and to expel me." S. M. pp. 28 and 29. "That there were no other papers or evidence, nor was any statement made that there had been any evidence except the statement made by him."

The last statement was corroborated by the testimony of Dr. William B. Roemer, sworn on behalf of plaintiff, who testified that he was, at the time of the aforesaid meeting, secretary of the County Society, and that the only papers, except the report of the censors, filed with him, were Exhibits 15, 16, 17, and 18. (These are the objectionable articles.) After the aforesaid proceedings, a vote was taken by the members of the County Society, and the plaintiff was expelled.

Both upon the proceedings had before the board of censors and also at the meeting of the County Society, on July 14, 1914, the plaintiff read, or attempted to read, certain letters received from the different publishers of the newspapers in which the objectionable articles appeared. The following is a copy of the letter purporting to be received from the Sunday editor of the New York American under date of June 22, 1909:

"June 22, 1909.

"Dr. W. B. Reid, Rome, N. Y.—Dear Sir: The article in the Magazine Section of the Sunday American under date of April 18, 1909, was secured by us through our regular correspondent, and published by us because we thought it particularly interesting.

It came through our regular news channels, and so, of course, was not solicited, written by, or paid for by either you or your associates. It appealed to us as an excellent news story, and we treated it as we always treat such subjects.

"Yours very truly,          M. Goodard, per A. M. Sunday Editor."

Letters, similar in character, were presented by the plaintiff, which were received from the Magazine of Industry, purporting to be published in Buffalo, N. Y., the Rome Sentinel, and the World, published in New York City.

[1, 2] That the plaintiff was entitled to a fair trial before impartial judges should not be disputed. A trial means a formal presentation of the charges, a presentation before a tribunal authorized to hear the same, formal proofs, not necessarily made with the formality required in courts of law, but proofs which, at least, present a colorable case against the member upon trial, and also means a fair opportunity to the accused to refute the case made by the person or persons preferring the charges. A trial does not mean that the court can take proof in the absence of the indicted member. It does not mean that the members of the court can, as individuals, at separate times and places, obtain information regarding matters under investigation, and, above all, a fair trial means that the judges shall be impartial. Omitting any of the foregoing in a proceeding, it becomes, not an agency to discover truth and work justice, but by such action it may become an agency to work injustice.

The following extracts from statements made by Mr. James T. Lewis, counsel for the defendant, the State Society, and from the brief of the learned counsel for the defendant, the County Society, show the position of these defendants in regard to the powers of the board of censors. Mr. James T. Lewis said upon the second appeal of the plaintiff to the State Society (Mr. Lewis was acting at that time as an associate president of the board of censors) as follows:

"Mr. Lewis: How do you know whether or not the censors had in their inside pockets this stuff (referring to evidence before the board of censors)? How do you know it?

"Dr. Reid: I do not know what they had in their pockets. I only know what they presented to the meeting assembled.

"Mr. Lewis: They might have been sitting there with this stuff in their pockets."

Sten. Min. upon second appeal to State Society, page 25.

The following appears in the brief of the learned counsel for the defendant, the County Society:

"Section 9 reads: 'After investigation of the charges, they shall report their findings to the society.' The censors' report states that they did just this. The report stands unimpugned. Neither the plaintiff, nor we, know what the censors did, other than appears in their report."

The learned counsel further states:

"The censors had before them these exhibits, 15, etc. What else they had or learned after investigation, their report does not disclose. There is nothing in the constitution or by-laws that limits or prescribes their field of investigation."

According to the foregoing, the position, as I understand it, of the two defendant societies is that the board of censors could, collectively, or each member for himself, in his own way, obtain any information in regard to the publication of the articles in question; that such information might be garnered in the barber shop or the corner drug store; it might be mere rumor; it might be untrue; it might be capable of explanation; it might emanate from hostile witnesses; but, in any event, however obtained, the accused had no opportunity to refute it; in fact, did not know of its existence. If this be a fair trial in any just sense, what is the purpose of giving the accused 10 days' notice of the hearing? That would seem to be unnecessary.

One of the members of the board of censors, who was not present at the hearing held on July 12, 1909, joined his associates in signing the report of that board, which report, with other things, states:

"After hearing all the evidence obtainable and making several investigations, this board, after careful and deliberate judgment, would report," etc.

What investigations this nonattending member made does not appear. He must have had the "stuff in his pocket."

[3] Unless the board of censors acted upon "the stuff in their pockets," there certainly was no proof before them connecting the plaintiff with the publications in question. The publication of these articles might have been procured in many ways without the plaintiff's acquiescence. Without going into a statement of the many ways by which such publications might have been procured without the knowledge of the plaintiff, it is sufficient to say that the burden rested upon the accusers to show that, at least by colorable evidence, he did so procure their publication.

Suppose that the plaintiff had been sued for libelous matter contained in the newspaper articles in question, and the plaintiff in that case had produced the articles in court, and made no other proof connecting the defendant in that case with the articles, it would require considerable temerity on the part of counsel to argue that there was anything in the supposed case to submit to a jury.

[4] I am not unmindful of the fact that this court has no right to consider the weight of the evidence presented or to substitute its judgment for the judgment of the plaintiff's fellow members; but this court has the right to determine whether there was any evidence against the plaintiff, and if the determination of his guilt upon the charges preferred against him was totally unsustained by any evidence, such determination is contrary to natural justice, and subject to review and correction.

[5] I think the plaintiff was not accorded all of his rights in the failure of the board of censors to consider his proof, or some part of it. The plaintiff was accused of procuring the insertion of objectionable articles in newspapers named. He denied the charge, and he offered in evidence letters from publishers, or persons connected with several newspapers, to the effect that such charge was not true. This evidence was, at least, relevant to the issue. It is true that the letters received and offered by the plaintiff were not admissible upon

their mere production, and it is true that their contents were hearsay; but in fairness, if that was the reason for their exclusion, he should have been given time to produce the writers. The effect of the expulsion of a member of the medical profession from his county society is to him a very serious matter, and is far-reaching in its consequences to him, and a body having the responsibility of determining the facts in so important a trial should rather err on the side of enabling the accused physician every opportunity to review the charge made against his professional conduct.

[6] The plaintiff was deprived of having his cause determined by an impartial court or jury by the action of the County Society in allowing, through its presiding officer, the intemperate remarks of at least two of its members at the meeting when plaintiff was expelled. One of the physicians was permitted to state a personal difficulty he had with the plaintiff, the substance of which was that the plaintiff had instigated an action of malpractice which had been brought against the speaker. The plaintiff objected to these remarks as not being embraced by the charges he was called upon to answer. It is hard to conceive a statement more prejudicial to the rights of a physician under trial by a jury of physicians than for one of the triers, presumably in good standing, to state, in substance, that the physician on trial had procured, or assisted in procuring, some one to sue the speaker for malpractice. Another member of the Society, who was also a member of the board of censors, characterized, in his address to his fellow physicians, the plaintiff as a black-hearted scoundrel, unfit to be a member of that society, and that he was a liar, and that the speaker would not believe him on oath. Bear in mind that these two physicians were not only about to vote upon the question of plaintiff's guilt or innocence, but were influential members of the County Society, and many of the 94 physicians present were presumably unacquainted with the facts, and must have been influenced by these intemperate remarks. That the two members of the County Society who made the objectionable remarks were disqualified to vote upon the question of the plaintiff's expulsion is too apparent for argument. The Code of Civil Procedure (section 46) declares:

A "judge shall not sit at such in, or take any part in the decision of a cause or matter to which he is a party, or in which he * * * is interested."

As stated in People ex rel. Pond v. Trustees, 4 App. Div. 403, 39 N. Y. Supp. 607, quoting from the case of Oakley v. Aspinwall, 3 N. Y. 547:

"The first idea in the administration of justice is that a judge must necessarily be free from all bias and partiality. He cannot be both judge and party, arbiter and advocate, in the same cause. Mankind are so agreed in this principle that any departure from it shocks their common sense and sentiment of justice."

But to justify a court in interfering with the decision of the regular constituted authority of the organization of which the plaintiff was a member, it must be apparent that such action in all probability did affect the action of the County Society, and it seems to me that many of the

members of the society must have been, and in fact were, influenced in their action by the aforesaid statements.

It is the purpose of the State and County Medical societies to keep their great profession free from incompetent and unprincipled men, and from improper practices which would tend, not only to deceive the public, but endanger health and life. But, as these medical gentlemen insist upon sanitary conditions when they perform an operation, so the courts insist that upon the trial of a person accused of wrongdoing, upon such conditions that will insure in the end the fullest measure of justice. Bear in mind that this is not a question of Dr. Reid's guilt or innocence of the charges against him, but a question whether he has been afforded the protection given the meanest criminal charged with a heinous crime; i. e., the right to a fair trial before an impartial court. This right is of infinitely more importance than that the offense with which the plaintiff in this case was charged should be punished, and in protecting him in this right, the court is protecting every member of that honorable profession from possible injustice.

[7] The Medical Society of the State of New York is made a party to this action, I think, improperly. This Society simply reviewed, according to the provisions in its constitution and by-laws, the action of the County Society; and this is in no sense an appeal from any action heretofore taken by the State Society. If the plaintiff is restored to membership in the County Society, he is automatically restored to membership in the State Society.

There must be judgment restoring the relator to membership in the County Society, with costs. The action against the State Society is dismissed, with costs.