THE PEOPLE, *ex rel.* Gray, *vs.* THE MEDICAL SOCIETY OF THE COUNTY OF ERIE.

The power given, by statute, to medical societies, to make by-laws and regulations relative to the admission and expulsion of members, although conferred in general terms, is not an arbitrary, unlimited power. The by-laws, rules and regulations are not to be contrary to, nor inconsistent with, the laws of the state.

A by-law must be reasonable, and adapted to the purposes of the corporation.

Where a medical society established a tariff of fees, for medical services to be performed by its members, and fixed a minimum salary to be received by any member who should be appointed to any public office, in a professional capa-

The People *v.* Medical Society of the County of Erie.

city, and adopted a resolution declaring that it should be dishonorable for any member of the society to accept any appointment or perform any services contained in such tariff of prices, at a less sum than was therein specified; and subsequently, in pursuance of a by-law to that effect, expelled a member for a violation of this regulation; *Held* that the regulation was void, as being unreasonable, and against public policy, and contrary to law; that the expulsion of the member was unauthorized and illegal; and that a mandamus would lie, directing that he be restored, or recognized as a member of the medical society.

MOTION for an alternative mandamus. The relator represented that he had been duly licensed to practice as a physician and surgeon in this state. That at a regular meeting of the Medical Society of the County of Erie, held in January, 1850, he was duly admitted a member of the society. That at a semi-annual meeting of the society, held in June, 1854, a tariff of fees for medical services and medical appointments in and for the city of Buffalo and Erie county was adopted, in the absence of the relator, viz: "For physician to the almshouse of the county, $600 the minimum price; for physician to the penitentiary of the county, $300 as the minimum price; for physician to the jail of the county, $150 as the minimum price; for physician to the poor of the city of Buffalo, for medical district No. 1, $250; district No. 2, $125; district No. 3, $125; district No. 4, $100; for attending coroners' inquests, post mortem examination, $10, and for viewing body, $5, mileage to be charged according to the rates of the Buffalo fee bill; for health physician of the city of Buffalo, $1000 as the minimum price." The society, at the same meeting, also adopted a resolution that it should be dishonorable for any member of the society to accept any appointment or perform any services contained in such tariff of prices at a less sum than therein specified. In October, 1855, the relator was appointed by the board of supervisors of the county of Erie to visit the jail and perform medical services there when required during the year then ensuing, at and for the compensation of one dollar a visit. The relator accepted the appointment and entered into an agreement with the board of supervisors and entered upon the performance of the agreement.

At the semi-annual meeting of the medical society, certain

proceedings were had in relation to the relator, and a committee was appointed to report upon the subject of complaint. The committee reported among other things, that the relator had been guilty of an infraction of the laws of the society, and reported certain resolutions which were adopted by the society, as follows : 1st. That accepting to serve the public authorities for any other minimum amount and by any other manner of compensation than by salary, as fixed by the rules of the society, is a clear and palpable infraction of its laws. 2d. That the action of Dr. Gray in accepting office, as admitted by himself before the society this day, merits and hereby receives an expression of the disapprobation of the society ; and that provided he immediately retires from the position which he holds in violation of the rules of the society, farther action in the case shall be waived. A copy of the resolutions was served upon the relator, who declined to retire from the position he occupied under his contract with the board of supervisors. At an adjourned meeting of the society, the relator was, by a vote of the members of the society, expelled from the society, for the cause here stated. At a subsequent meeting the society refused to recognize the relator as a member of the society, and to receive his vote at an election of officers of the society. The affidavit of the relator contained a very full and minute statement of the facts relating to the questions of his rights and his expulsion from membership. But the facts as here briefly stated are sufficient to present the real question, and the question discussed by the court.

*James G. Hoyt,* for the relator.

*J. Thompson,* for the defendant.

MARVIN, J. The motion must be granted. It is impossible, in any view which I have been able to take of the question presented by this motion, to sustain the action and position of the " Medical Society of the County of Erie." The society has mistaken its rights and powers. It will be important to ascertain what this corporation is ; the objects of its creation, and

the powers with which it is clothed, so far at least as to determine whether it was vested with the power exercised in the present case.

The corporation has its existence under the act " to incorporate medical societies, *for the purpose of regulating the practice* of physic and surgery in this state," passed April 10, 1813. The practice of physic and surgery, in the city of New York, was regulated by law as early as 1760. And general regulations for the whole state were adopted in 1767, by which the chancellor, a judge of the supreme court, or common pleas, or a master in chancery, was authorized to license physicians and surgeons to practice. In 1806 an act was passed establishing medical societies in the state, and a state medical society, and repealing the former act. The act of 1813 was a revision of the act of 1806. It is important to notice the preamble to the act of 1813, thus : " Whereas well regulated medical societies have been found to contribute to the diffusion of true science and particularly the healing art." The first section makes it lawful for physicians and surgeons in the several counties of the state, who were then authorized by law to practice in their several professions, except in those counties where medical societies had been then incorporated, to meet together and choose the officers named in the act, and upon being so organized, it was declared that such societies should be bodies corporate and politic. The medical societies of counties already incorporated were to continue to be bodies corporate and politic. The act contains many provisions touching the meetings and proceedings of the societies. They are authorized to examine students, and for this purpose to appoint censors and give diplomas. By the 13th section, the societies are authorized to make such by-laws and regulations relative to the affairs, concerns and property of said societies, relative to the admission and expulsion of members, and relative to such donations or contributions, as a majority of the members, at their annual meeting, shall think fit and proper; provided that such by-laws, rules and regulations be not contrary to, nor inconsistent with, the constitution and laws of this state, &c.

The power is here given to make by-laws and regulations relative to the *admission and expulsion of members*. It is in general terms. But this is not an arbitrary, unlimited power. The by-laws, rules and regulations are not to be contrary to, nor inconsistent with, the laws of the state.

Regarding the tariff of prices for medical services, adopted at the semi-annual meeting in June, 1854, as a regulation, the question will arise whether it was a valid regulation, authorized by law, and whether for a violation of it by a member, the society had the power of expulsion. A serious doubt may be here raised whether, if the *matter* of the regulation is not objectionable, it ever had any binding force. This regulation was made at a *semi-annual* meeting of the corporation. The statute only authorizes the society to make by-laws and regulations at its *annual meeting*. It may be very important that the power to make by-laws, rules and regulations, for a violation of which penalties, upon members, may be imposed, should only be exercised at the *annual meeting*, or at certain times fixed by law, so that all the members may know in advance, and attend. But I shall waive this question, and proceed at once to the important question in the case, whether the society had the authority to establish such regulation, and for a breach of it to expel the relator.

It is declared by one of the by-laws of the society, that every member who shall neglect or refuse to comply with the by-laws and regulations of this society &c., shall be expelled from said society, upon a vote of a majority of the members present. This can, of course, have no application, except to a neglect or a refusal to comply with such by-laws and regulations as the society was authorized, by law, to make, and also to enforce by expulsion.

When a corporation is duly erected the law tacitly annexes to it the power to make by-laws or private statutes for its government and support; so that the corporation in the present case would have had the power to make by-laws had the statute been silent upon that question. It is usual to confer the power by the charter or law authorizing the corporation. If the power is expressly conferred and in general terms, it is construed as an

authority, conferred for the purpose of enabling the corporation *to accomplish the objects of its creation, and the power, in its exercise, is to be limited to such objects or purposes.* (*Ang. & Ames on Corp.* 268. 2 *Kent*, 296. *Grant on Corp.* 76.)

A by-law must not be at variance with the general law of the land. It must be reasonable, and adapted to the purposes of the corporation. Kent says these corporate powers of legislation must be exercised reasonably, and in sound discretion, and strictly within the limits of the charter, and in perfect subordination to the constitution and general law of the land, and the rights dependent thereon. Subject to these limitations, the power to make by-laws may be sustained and enforced by just and competent pecuniary penalties. (2 *Kent*, 296. *Grant on Corp.* 76. *Ang. & Ames*, 275, 281, 286. *King* v. *Corp. of Newcastle*, 7 *T. R.* 548. *King* v. *Toppenden*, 3 *East*, 186.)

What were the objects and purposes of the corporation? In the preamble to the act the legislature say, that well regulated medical societies have been found to contribute to the *diffusion of true science, and particularly the knowledge of the healing art.* The act then authorizes the physicians and surgeons in the several counties of the state to meet and choose certain officers, and when so organized, declares them to be bodies corporate and politic. It provides for the examination and licensing of students and for the mode of managing its affairs.

Can it be said, with any plausibility, that the establishing of a tariff of prices for medical services, was a legitimate object of the creation of the corporation, or that it was necessary, or, in any degree contributed to the accomplishment of the purposes or objects for which the law authorized the corporation? I can see no connection between the purposes to be accomplished by the creation of the corporation, and its regulation touching the compensation to be exacted by its members for services to be rendered to the public authorities of Erie county and the city of Buffalo. And I have not understood the corporation or its counsel, as putting the vindication of this regulation upon such ground; and yet, as we see by the well settled rules of law, unless it can be vindicated upon such ground, it cannot be

sustained as a regulation, or by-law, binding upon the members of the corporation.

All the purposes of the corporation can be well accomplished without interfering in the least, with the natural and private rights of each member to agree with the public authorities or others, for such compensation for his services as he may please. The rule established by the society is unreasonable ; not that it fixes an unreasonable price for the specified services, (as to that I do not know,) but it is unreasonably restraining and oppressive upon its members. It interferes with their private rights.

The regulation was not only unauthorized by the law but it is in conflict with well settled principles of law. It was the result of a combination to coerce the public authorities of Erie county and the city of Buffalo, to make a certain compensation for certain medical services, not less than a minimum sum fixed. Such a combination is, I have no doubt, unlawful at common law. It is in restraint of the rights of the public authorities and the individual members of the society.

It is made the duty of the superintendents of the poor to appoint a physician of the poor-house, (*Laws of* 1851, *p.* 532.) And yet, if the regulation of the medical society of Erie county is to prevail, and is to be obeyed by the members of the society, the superintendent of the poor will not be able to procure the medical services of any one of the members of the society without paying the compensation fixed and without any regard to the state of health of the county poor, or the amount of services that may be required. A physician, entirely competent, may be willing to render the services for half the sum fixed in the tariff, and yet if he adheres to the regulation he must decline the employment. This entire regulation is in conflict with the law of the land, and cannot be sustained. It conflicts with the law and its policy in relation to contracts and trade. The law permits and encourages great freedom in contracts and in trade and is constantly inviting competition. The skill of the professional man is his capital in trade ; and he has a right to employ it for a compensation satisfactory to

him, and thus obtain a livelihood. (*Angell & Ames on Corp.* 275. 3 *East*, 186. 1 *Blk. Com.* 876.) See *Dunham* v. *Trustees of Rochester*, (5 *Cowen*, 462,) where a by-law was held to be unauthorized as not being *prudential*, and as being against the freedom of trade.

In *The People* v. *Medical Society of New York*, (3 *Wend.* 426,) it was held that an initiation fee may be demanded from physicians and surgeons on becoming members of county medical societies. It was held that such charge was not contrary to or inconsistent with the laws of the state, and that it was usual in most societies of the kind. It might well have been added, that by the 15th section of the act of 1813, the power to charge an *admission* fee is impliedly given.

Enough has been said, I think, to show that the regulation in question was wholly unauthorized, and that it conflicts with public policy and the general law of the land. It follows that the expulsion of the relator was unjustifiable.

It seems to have been supposed that, having adopted this regulation, and having provided in the by-laws that every member who should neglect or refuse to comply with the by-laws and regulations of the society, should be expelled upon a vote of a majority of the members present, the society had the right, in the way of discipline, to expel a non-complying member. The rights of a member do not depend upon so frail a tenure. They are rights regulated and protected by law. The society is not simply a voluntary association of gentlemen, for social purposes or mutual improvement, under rules and regulations as adopted by themselves. But it is organized under the statute, and such organization is a corporation. Its powers are derived from the statute, and its members have certain well defined and valuable rights. Such rights are a franchise, and expulsion is disfranchisement. I shall not stop here to show the importance of the relator's rights as a member of the society. The law has made it his duty to become a member. That his rights were important and valuable is not denied. Expulsion or disfranchisement is a matter of serious import, and it is important to advert to some of the rules of law relating

to such questions. Disfranchisement is defined to be the tak-ing a franchise from a man for *some reasonable cause.* (*Grant on Corp.* 263.) The author remarks that, to entrust corpora-tions with an arbitrary power of the kind, would tend greatly to disturb the peace of corporations, and to defeat many of the objects of their institution, for it would furnish ready means to an unscrupulous majority, of compassing many pri-vate and personal objects of their own, by means of the corpo-rate charter. The legal causes of disfranchisement are thus stated. 1. Offenses against the corporator's duty to the corpo-ration, as a member of it. 2. Offenses of a heinous, infamous character, affecting the corporator's duty as a subject, being indictable at common law. 3. Offenses compounded of the two. It will not be necessary to notice the 2d and 3d causes. Was the relator guilty of any offense against his duty to the corpo-ration? It has been laid down as a rule that such offenses consist of "things done that work to the destruction of the body corporate, or to the destruction of the liberties and privileges thereof." (*Grant on Corp.* 264. 2 *Kent's Com.* 297 *to* 299. *Angell & Ames on Corp.* 349, 350.)

This rule may be somewhat too restricted in some special cases, but it is the general and leading rule, and rarely departed from. If the member does acts calculated to destroy the cor-poration or its liberties and privileges, he may be disfranchised. He thus forfeits his right to membership.

*The Commonwealth* v. *St. Patrick Benevolent Society*, (2 *Binn. R.* 441,) is much in point in this case. In that case by a by-law, *vilifying any member*, was declared to be a crime against the society, and for such crime, expulsion was author-ized. One of its members was convicted under the by-law, and expelled. The court, after stating and recognizing the above rules, declared the by-law void and ordered the restoration of the expelled member. The test applied was, whether the by-law was necessary for the good government and support of the affairs of the corporation; and it was held that it was not, and that without an express power in the charter, no man can be disfranchised, unless he has been guilty of some offense, which

The People *v.* Medical Society of the County of Erie.

either affects the interests or good government of the corporation, or is indictable by the law of the land.

*Fawcett* v. *Charles,* (13 *Wend.* 473,) is instructive upon the question. In that case it was held that a county medical society had not the power to expel a member for the cause that he did not possess the requisite qualifications and obtained his admission by false pretenses. The leading rules, as above stated, are referred to with approbation, and it was held that such society, being a body corporate, has the power of expulsion, as an incident to its constitution ; that the power cannot be exercised without a previous conviction on indictment in a criminal court for the offense charged, except when the offense relates merely to the official or corporate character of the accused, and amounts to a breach of the condition expressly or tacitly annexed to his franchise.

By the revised statutes concerning the practice of physic and surgery in this state, county medical societies are authorized to prefer specific charges against any member, of gross ignorance or misconduct in his profession, or of immoral conduct or habits. These charges are to be tried by the judges of the county court, and if they find the charges true, they are to make an order expelling the member from the society or suspending him for a limited period. (1 *R. S.* 452, 3.) I refer to these provisions of the statute in connection with the three general rules as above stated touching the power of corporations to disfranchise a member, for the purpose of calling attention to the nature of the charges ; gross ignorance, misconduct in his profession, immoral conduct or habits, and remarking that the legislature is supposed to have understood the rules as established by the common law, and that the cases specified in the act did not or might not come within those rules so as to authorize the societies to try the member and expel him; hence the legislature provided the remedy as specified in the statute. It did not confer the power upon the medical societies, but upon the judges of the county court. Here is a legislative intimation, showing the extreme care taken of the rights of members of these societies, and admonishing the societies that their power of expulsion over its

members is not arbitrary, but confined and carefully restricted to the causes ascertained by the common law. (*See Matter of Newell Smith*, 10 *Wend.* 449 ; *Ex parte Paine*, 1 *Hill*, 665.)

I have examined this case at greater length, perhaps, than was necessary. *The People upon the relation of Hill against this Society*, presenting the same and other questions arising upon the pleadings, was argued very fully at the same time. In the present case it was conceded that the papers, upon this motion, present fully and fairly the real question between the parties. The controversy, between the society and the relator, seems to have been conducted in a spirit of fairness, frankness and courtesy. The society claiming the right of expulsion for the cause stated, and the relator controverting such right. The society is clearly in the wrong. The rights of its members, to the enjoyment of their franchises, are more secure than the society seems to have supposed, and the law will protect each member in the enjoyment of his rights, until such rights have been legally forfeited. In conclusion :

1. The regulation in question was unauthorized. 2. It was unreasonable. 3. It was against public policy and the law. 4. The disfranchisement of the relator was unauthorized and illegal.

It follows that he must be restored or recognized as a member of the medical society, and be permitted, without molestation, to enjoy all the rights and privileges of a member.

[ERIE SPECIAL TERM, July 6, 1857. *Marvin,* Justice.]