(70 Misc. Rep. 615.)

EWALD v. MEDICAL SOCIETY OF COUNTY OF NEW YORK et al.

(Supreme Court, Special Term, New York County. February, 1911.)

1. CONSTITUTIONAL LAW (§ 125*)—OBLIGATION OF CONTRACTS—MEDICAL SOCIETIES—CHARTER—AMENDMENT.

The charter of a county medical society, incorporated under Laws 1806, c. 138, is in the nature of a contract, and is not subject to alteration, amendment, or repeal by the Legislature except in the exercise of the police power by acts regulating generally the conduct of citizens of the state.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 362–413; Dec. Dig. § 125.*]

2. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—CHARTER—STATUTES.

2 Rev. Laws 1813, p. 219, c. 94, purporting to be a reincorporation of all existing medical societies and conferring enlarged powers on them, is a mere offer, and does not operate to enlarge the powers of existing societies, in the absence of an acceptance of the benefits of the act and reincorporation under it.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

3. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—POWERS.

A medical society incorporated under Laws 1806, c. 138, has only such powers as tend to enable it "to contribute to the diffusion of true knowledge and particularly knowledge of the healing art," and a by-law providing that members may not resign while under charges is punitive in its design, and not within the purposes of the society.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

4. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—MEMBERSHIP.

The provision of Laws 1806, c. 138, that it shall be lawful for the physicians and surgeons of the several counties to meet together, confers on every physician and surgeon in the county a right to membership in a society incorporated under the act, and the right of the society to expel

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is limited to those causes for which a member's license to practice may be revoked under Public Health Law (Consol. Laws 1909, c. 45) § 170.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

5. ASSOCIATIONS (§ 9*)—CORPORATIONS (§ 172*)—MEMBERSHIP—RESIGNATION —NECESSITY OF ACCEPTANCE.

In the absence of any statute, rule, or law to the contrary, a member of a voluntary association or of a membership corporation may withdraw at any time, and no acceptance of his resignation is required.

[Ed. Note.—For other cases, see Associations, Dec. Dig. § 9;* Corporations, Dec. Dig. § 172.*]

6. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—MEMBERSHIP—BY-LAWS.

A by-law of a medical society which provides that, if a resignation is accepted, the member thereby severs all connection with the society, and that no resignation shall be accepted from a member owing dues or assessments, implies that the resignation of a member who does not owe dues or assessments shall be accepted.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

7. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—MEMBERSHIP—SUSPENSION.

The suspension of a member of a medical society is a judicial act following a trial for an offense, and forbids the suspended member from exercising rights and privileges of membership.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

8. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—SUSPENSION OF MEMBERS—REINSTATEMENT.

A medical society whose constitution provides as a qualification for membership "good moral and professional standing" may not restore to full membership one suspended for conviction of conduct that would disqualify him from membership for the sole purpose of expelling him for similar offenses.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

9. PHYSICIANS AND SURGEONS (§ 9*)—MEDICAL SOCIETIES—TRIAL OF MEMBERS —WANT OF JURISDICTION.

Where a medical society tries a member on charges which upon conviction will result in expulsion, it is exercising judicial powers, and is, to that extent, an inferior tribunal, and may be enjoined where such a trial would be without jurisdiction.

[Ed. Note.—For other cases, see Physicians and Surgeons, Dec. Dig. § 9.*]

Action by Louis Anton Ewald against the Medical Society of the County of New York and others. On motion to continue pendente lite an order enjoining defendants from bringing plaintiff to trial. Motion granted.

For reversal of this order by the Appellate Division, see 144 App: Div. 82, 128 N. Y. Supp. 886.

Samuel L. Frankenstein, for plaintiff.
Almuth C. Vandiver, for defendants.

GOFF, J. Plaintiff is a physician. Charges were preferred against him in the defendant society. He immediately resigned, and, appre-

---

hensive that, if a trial was had, expulsion would follow, he seeks to restrain the society and the defendants, its board of censors, from proceeding with the trial on the ground that he is no longer a member.

On March 7, 1910, charges were preferred against the plaintiff that in a magazine article written by him he had made false statements regarding operations which he therein claimed to have performed. On May 10, 1910, he was found guilty, and suspended from membership for one year from June 1, 1910. On September 30th following charges were preferred against plaintiff and his associate in a hospital that they had falsified the hospital records to prevent the discovery of the false statements so made. Plaintiff's associate was tried, found guilty, and expelled. Charges were not served on plaintiff because he was then under suspension, but, at a meeting of the board of censors held on December 12th it was resolved that plaintiff should be restored to active membership so that he might be brought to trial, and that the charges should be served forthwith. This resolution was received by the comitia minora, a standing committee to which all other committees are amenable. That committee adopted a resolution restoring plaintiff to active membership. On December 13th plaintiff was notified of the resolution. On December 14th he sent in his resignation from the society. On December 15th his resignation was received by the secretary and referred to the comitia minora. On December 17th, the new charges were served upon plaintiff, who refused to receive them on the ground that he was not a member of the society. Plaintiff had actual knowledge of the new charges on December 1st, for on that date, testifying as a witness on the trial of his associate, he admitted that he had heard them read, but there is no evidence that at any time before the attempted service upon him he knew of the action of the board of censors directing that he be tried. He now moves to continue pendente lite a preliminary restraining order enjoining the defendants from bringing him to trial and from various other acts which he deems connected with and incidental to that purpose, for the reason, among others, that he resigned from the society, which, therefore, has no jurisdiction over him, and that an unfavorable report finding him guilty and expelling him would greatly damage him in the practice of his profession and result in his dismissal from various medical institutions with which he is connected and in which he holds appointments.

The question to be decided in this case is whether or not plaintiff's resignation became effective despite the fact that charges were pending against him. That they were pending, although not served upon him, has been held in People ex rel. Eakins v. Roosevelt, 12 Misc. Rep. 622, 34 N. Y. Supp. 228, affirmed 14 Misc. Rep. 531, 35 N. Y. Supp. 1085, affirmed 149 N. Y. 574, 43 N. E. 989. There is thus involved the validity of article 6 of chapter 1 of defendant society's by-laws in force at the time when plaintiff made his application for membership and at the time he sent in his resignation. So far as relevant, it is as follows: "No resignation shall be accepted from a member owing dues or assessments or under charges."

[1] Had the society power to enact this by-law? It is incorporated under chapter 138 of the Laws of 1806, the substance of which is:

"Whereas, well regulated medical societies have been found to contribute to the diffusion of true science and particularly the knowledge of the healing art; therefore be it enacted * * * that it shall and may be lawful for the physicians and surgeons in the several counties in this state, now authorized by law to practice in their several professions * * * to meet together in their several counties and * * * so convened * * * shall proceed to the choice of a president, vice-president, secretary and treasurer * * * and whenever the said societies shall be so organized * * * they are hereby declared to be bodies corporate."

In 1806 the first Constitution of the state was in force, adopted April 20, 1777, which did not prohibit the enactment of general corporation laws unless there be reserved therein the power to alter, amend, or repeal charters. In this case, as in Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629, decided 1819, the charter was a contract between the corporation and the state. In this case, as in that, the consideration of the contract was benefit to the public by diffusion of knowledge, and the fact that it was established in part for educational purposes did not make it per se a public corporation so as to subject its charter to amendment at the will of the Legislature. The charter granted by the act of 1806 was irrepealable, and it was unamendable by the state except in the exercise of its police powers and by acts regulating generally the conduct of citizens of the state.

[2] In 1813 an act was passed (2 R. L. 1813, c. 94, p. 219) which provides (section 14):

"It shall be lawful for the respective (county medical) societies to make such by-laws and regulations relative to the * * * expulsion of members as they * * * shall think fit and proper."

That act purports to be a reincorporation of all existing county medical societies. Section 23 reserves to the Legislature the right to alter, modify, or repeal the act; in other words, to repeal charters of societies becoming reincorporated under it (under section 2). Under the Dartmouth College Case, supra, the act of 1813 must be considered as a mere offer of incorporation to this defendant, requiring acceptance by the society before it could avail itself of any of the enlarged powers therein granted. If it be considered as a compulsory incorporation, it might have been followed by a repeal of the act—that is to say, of defendant's new charter granted by the act—so that in this way the state could absolve itself from its contract of 1806. There is not presented to the court any evidence that defendant society did accept the act. Hence there is no evidence that it obtained enlarged powers by virtue of the new statutory provisions.

The same reasoning applies to other acts of the Legislature conferring upon defendant society power to expel members. By section 8 of article 2 of the membership corporations law (Consol. Laws 1909, c. 35), "the by-laws of any such corporation may make provisions * * * regulating the * * * expulsion of members." By section 213 of article 14 of the same law county medical societies are given power "to establish such rules and regulations for the government of its members as they may deem fit, provided the action of such societies receive the sanction of the state medical societies

representing such county medical society. and are not inconsistent with the laws of the state"; and by section 214 of article 14 of the same law:

"Each county medical society shall have full power and authority to enforce discipline among its members and obedience to its rules and regulations, with power to expel or otherwise discipline as they may deem most advisable for the best interests of said society."

All these acts are in the same category as the act of 1813 because they became laws after the adoption of the Constitution of 1846, which prohibited the enactment of laws creating corporations unless such laws should reserve power to alter or repeal corporate charters granted under them. So far as appears, none of these laws have been in the legal sense accepted by defendant society; hence none are applicable.

Undoubtedly a corporation has power to enact by-laws without express authority, but they must not be in excess of its chartered powers. Thomp. Corp. § 998; Angell & Ames, Corp. § 343. The chartered purposes are not capable of extension by recitals in its constitution or by provisions in its by-laws.

[3] What, then, are the powers of this corporation? The body of the act of 1806 incorporating defendant society confers no powers except those which are common to all corporations—to have a name and officers; to sue and be sued and have a common seal. No other powers are expressly granted unless they appear in the preamble, where it is recited:

"Well regulated medical societies have been found to contribute to the diffusion of true knowledge and particularly knowledge of the healing art."

"The court should give effect to the preamble to this extent, namely, that it shows what the Legislature is intending." Endlich, Interp. Stat. § 62.

"In the construction and interpretation of charters in all cases of doubt the legislative intention is to control." Thomp. Corp. § 298.

Here, perforce, the intention must be gathered from the preamble, since it appears nowhere else. "It is a fundamental rule that charters are to be construed strictly. * * * The law will indulge in no presumptions that the state intended to grant anything not expressed." Thomp. Corp. § 299. Accordingly it has been held that the corporate purpose being "to contribute to the diffusion of true science, and particularly the knowledge of the healing arts," the powers of defendant society are those which tend to accomplish such objects and such objects only. People ex rel. Gray v. Medical Society of the County of Erie, 24 Barb. 570. Doubtless there are other objects inherent in the words "medical societies"—the power to meet and have a place and conveniences for meeting, to give lectures on medical subjects, to collect and preserve scientific data, and the like—but all these powers inherent in the words "medical societies" look to the relations of the members among themselves. There is a statement in article 2 of chapter 1 of defendant's constitution that one of defendant's objects is to "aid in regulating the practice of medicine and surgery in this state." That statement is merely an assumption. No such purpose was intended by the act of its creation.

This society differs distinctly from a club organized for social pur-

poses.  To those purposes social clubs often superadd others, in the direction, perhaps, of art or science or political reform.   In social clubs it is necessary that there be congeniality among the members, based on mutual respect, so that if any one of them is guilty of misconduct—not necessarily illegal or immoral, but for which an association of gentlemen may "send him to Coventry"—undoubtedly the club has power to expel.  Hopkinson v. Marquis of Exeter (L. R.) 5 Eq. 63.   Before the act of 1806 medical societies were undoubtedly clubs in the social sense, having such right of expulsion, but, when defendant society accepted its incorporation, it came under the restrictions of the act.  One such restriction is that every duly licensed physician in the county is eligible to membership and may compel admission by writ of mandamus.  People ex rel. Bartlett v. Medical Society of the County of Erie, 32 N. Y. 187.  Although the Erie County Society was incorporated under the act of 1813 (see People ex rel. Gray v. Medical Society of County of Erie, supra), the same principles are applicable to defendant, because the act of 1806 prescribes that "it shall * * * be lawful for the physicians and surgeons in the several counties * * * to meet together."  That means that every physician and surgeon in the county has a right of membership.  By the act of 1806 the right to exclude from membership is limited to those causes for which a member's license to practice may be revoked under section 170 of the public health law (Consol. Laws 1909, c. 45), so that the social purposes of the society have become subordinate to those which are professional.  On proof of any offense such as is mentioned in section 170, a member may be expelled from the society through its committee constituted by it for the trial of such charges and for the pronouncement of judgment.

[4] What is the purpose of that provision of the by-laws which forbids resignation under charges?  It cannot be that it is to vindicate the fair name of the society, because it is a measure not necessary to that end.  Resignation under charges carries an inference to the normal mind which is sufficient for that purpose.  If the accused member severs his connection with the society, that eliminates the obstacle to the attainment of its corporate purposes.  In Labouchere v. Earl of Wharncliffe (L. R.) 13 Ch. Div. 346, the by-law was that a member might be called upon to resign, and, if he refused, he might be expelled after inquiry.  Resignation under such circumstances was evidently deemed sufficient to vindicate the dignity of the exclusive "Beefsteak Club."

Compulsory continuance of membership under charges is evidently something more than vindication of the society and more than its duties and purposes under its charter.  The thought is that, if a member be permitted to resign under such circumstances, he may escape his just punishment of censure, suspension, or expulsion.  But defendant society is not a punitive body.  When the object is manifestly punitive, it is not within the powers of the corporation, because not tending to greater facility of social intercourse or to diffusion of science. The principle involved was considered in Calder Navigation Co. v. Pilling, in the English Court of Exchequer, 14 M. & W. 75.  There

the plaintiff company was incorporated to maintain a canal with authority "to make such new rules and by-laws and constitutions for the good government of the said company * * * and also for the well-governing of bargemen, watermen and boatmen who shall carry goods * * * upon any part of the said navigation." Plaintiff adopted a by-law that the canal should not be used on Sunday, and placed a chain across it on that day. The action was in trespass for breaking the chain and entering upon plaintiff's close. The court (Alderson, B.) said (after quoting from the charter):

"Now, looking at these words, it appears to me that all the power which the Legislature intended to give this company with respect to making laws for this navigation was solely to the orderly use of the navigation; that is to say, to regulate in what manner and order the navigation should be used, so as to secure to the public the greatest convenience in the use of it. The rules which they are empowered to make have nothing to do with moral and religious conduct, which are left to the general laws of the land and the laws of God. * * * So, again, they are empowered by this section to make by-laws 'for the well-governing of bargemen, watermen and boatmen who shall carry goods, wares and merchandise upon any part of the navigation.' I do not apprehend that these words mean the government of those persons with the view of regulating their good conduct and welfare, but only their conduct in their character of 'bargemen, watermen and boatmen' who shall carry goods, wares and merchandise along the navigation."

[5] So in the case at bar. Even if the defendant society should be deemed to have accepted the various provisions of the various laws mentioned which have been enacted since 1806 and to have been empowered by them to discipline and expel, members must be disciplined or expelled in their character of members, and not in their character of physicians. It is no part of the functions of the society to discipline physicians merely as such in their moral and ethical relations to the public outside of the society or to discredit them by expulsion merely as a deterrent to other physicians, whether members of the society or not. If a member desires to withdraw, the objects of the society are as well promoted thereby as by expulsion. To refuse his resignation that he may be tried, and, if found guilty of charges warranting expulsion, expelled, is not an act intended to eliminate the member's name from the roll of members. Primarily, it is an act intended to aid in regulating the practice of medicine by publishing the expelled member's disgrace and to cause such loss of practice as amounts approximately to a revocation of his license. To aid in regulating the practice of medicine is not one of the objects of the society. Prevention of fraud and quackery is not "diffusion of science." If, as a result of plaintiff's trial, he should be expelled, no one will thereby, directly or indirectly, gain an iota of additional knowledge of "true science" or of "the healing art." The functions which the society has thus assumed are the punitive powers of the state, with which, under our system of government, no corporation has yet been invested. Even when medical societies were authorized to take cognizance of charges against physicians (1 R. S. [2d Ed.] c. 14, tit. 7, § 3, p. 448) those charges were not tried by the society, but were prosecuted by the district attorney in the court of common pleas. Sections 5, 6, 7. The powers assumed by defendant society are part of

those which the state has now delegated to its board of regents under section 170 of the public health law.

[6] · Though the by-law be in excess of defendant's chartered powers, is it not valid as a contract? There can be no doubt that, in the absence of some statute, rule, or law to the contrary a member of a voluntary association or of a membership corporation may withdraw at any moment by saying to his associates, "I retire," and no acceptance is necessary. Any other construction of his rights would put it in the power of the majority to hold him liable for dues, and, in case of a voluntary association, possibly to make him responsible for the association indebtedness during the period measured only by his life. That a resignation in such case is valid without acceptance is the law of England (Finch v. Oake, 73 L. T. Rep. [N. S.] 716), and it is the law relative to directors and officers of corporations (Chandler v. Hoag, 2 Hun, 613, affirmed 63 N. Y. 624; Smith v. Danzig, 64 How. Prac. 320; Wilson v. Brentwood Hotel Co., 16 Misc. Rep. 48, 37 N. Y. Supp. 655; Noble v. Euler, 20 App. Div. 548, 552, 47 N. Y. Supp. 302; International Bank of St. Louis v. Faber, 86 Fed. 443, 30 C. C. A. 178). But if a member of an association enters into a contract with it concerning the duration of his membership, and to the effect that it shall continue until the happening of a certain event, the case is different. Such a contract exists when, as here, the applicant for membership promises in the event of election "to comply with all rules, regulations and by-laws passed by the society or adopted for its government." Voluntary associations may adopt such by-laws as they please. When adopted and consented to by any member they become binding upon him as contracts, but corporate by-laws cannot transcend corporate powers. No ultra vires by-law is any part of a member's contract with the corporation. The distinction is pointed out in Hess v. Johnson, 41 App. Div. 465, 58 N. Y. Supp. 983.

It is questioned whether plaintiff's resignation took effect immediately upon its receipt by the secretary, or whether it required acceptance before plaintiff ceased to be a member. The by-laws provides:

"All resignations shall be in writing. * * * If accepted the member thereby severs all connection with the * * * society. * * * No resignation shall be accepted from a member owing dues or assessments or under charges."

To provide that no resignation shall be accepted from a member owing dues or assessments or under charges is to provide that every resignation shall be accepted from members not owing dues or assessments and not under charges. "Expressio unius est exclusio alterius." The plaintiff owed no dues or assessments when he sent in his resignation. The words "or under charges" must be disregarded because in excess of corporate powers. Therefore plaintiff's resignation should have been accepted under the by-law. It should have been accepted as of the date of its receipt because there is nothing in the by-laws to interrupt plaintiff's right to resign immediately. It is not there provided that membership shall continue until acceptance except in the two cases mentioned, which are inapplicable to him. Since it should have been accepted as of the instant of its receipt,

the court will conclude conclusively that it was so accepted, for "equity will regard that as done which ought to have been done."

[7, 8] But even if plaintiff has not resigned, which is defendant's own viewpoint of the law, still the society is barred from proceeding with his trial. At the time that charges were preferred he was under suspension. The by-laws being silent as to the scope of the suspension, the general rule as to its meaning and effect must be applied. As defined in the Century Dictionary, suspension is "the temporary deprivation of office, power, prerogative or any other privilege and, in law, the temporary stop of a man's rights." The sentence of suspension was a judicial act. It followed a trial for an offense, and it forbade him from exercising the rights and privileges of membership. It was a right of a member under charges to answer, to defend, to cross-examine, and produce witnesses in his own behalf. If that right was taken from him, even temporarily, by suspension, it is manifest, that he could not be tried by any standard of fairness or justice. The difficulty was evidently appreciated by the "Comitia Minora," who resolved to surmount it by restoring him to active membership. In this they exceeded their power and violated their own organic law. Article 1 of chapter 2 of the constitution specifies the qualifications for membership. It says that "physicians in good moral and professional standing * * * are eligible to active membership." By its own act the society had adjudged him guilty of an offense that warranted discipline, and, in addition had received and acted upon charges of such grave professional misconduct as to call for the expulsion of his associate. How, under such circumstances, could he be regarded as in good moral and professional standing? If, in the first instance, he applied for membership and such charges had been made, it is inconceivable that he would have been considered worthy of membership, and yet he was restored to that which he could not originally have acquired and of which, by the act of the society, he had been deprived. Of course, the purpose of the restoration plainly was to acquire jurisdiction in order to try him, but while that purpose, from the society's point of view, may have been laudable, the method of executing it was unlawful and served to compass its defeat. As incidental to this phase of the case a thought is suggested: If plaintiff's restoration to active membership was unlawful, his resignation from what he did not rightfully possess had no force or effect, but a complete answer is found in the fact that he had an active membership on the expiration of the period of suspension the enforcement of which was simply postponed to a definite time, and that right he could relinquish at any time by resignation.

[9] It is undisputed that sentence of expulsion, if pronounced, would have a seriously detrimental effect upon the plaintiff, probably resulting in loss of practice and discharge from positions which he holds in various hospitals, for which damage he has no adequate remedy at law, nor has he, having resigned, the right of appeal to the Medical Society of the State of New York under section 214 of the membership corporations law. The society has power to try members who have not resigned. That power is of a judicial nature, and to

that extent the society is an inferior tribunal. Gregg v. Massachusetts Medical Soc., 111 Mass. 185, 15 Am. Rep. 24. Being without jurisdiction, this inferior tribunal may be restrained from its threatened action. Van Sinderen v. Lawrence, 50 Hun, 272, 3 N. Y. Supp. 25; Dainese v. Allen, 3 Abb. Prac. (N. S.) 212. The restraining order should not run against Drs. Goffe, Painter, and Kerley, whose term of office has expired, but should be continued against the society and the other defendants so far as to prohibit the taking of testimony upon the charges attempted to be served upon plaintiff on December 17, 1910, and from taking any proceedings, making any findings and publishing any report or decision thereon.

Ordered accordingly.