62 N.J. Super. 184 (1960)
162 A.2d 324
ITALO J. FALCONE, PLAINTIFF,
v.
MIDDLESEX COUNTY MEDICAL SOCIETY, AN UNINCORPORATED ASSOCIATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 13, 1960.
*186 Messrs. Wilentz, Goldman, Spitzer and Sills (Mr. Elias A. Kanter appearing), attorneys for plaintiff.
Messrs. Backes and Backes (Mr. Robert M. Backes appearing), attorneys for defendant.
VOGEL, J.S.C.
This is an action in lieu of mandamus by the plaintiff, Dr. Italo J. Falcone, to compel the defendant, Middlesex County Medical Society, to admit the plaintiff to full membership in the defendant association. The complaint also prays an adjudication of the plaintiff's rights, and such other relief as may be just.
The defendant society contends that the court may not compel the defendant society to accept plaintiff as a member for the reason that the defendant is a voluntary association and, as such, may freely exercise independent judgment in the selection of its membership.
In the alternative, the defendant society contends that even though a court may compel admission of a qualified person to membership, the plaintiff herein is not qualified because he does not have an M.D. degree based upon four years of study in a medical school approved by the American Medical Association (hereinafter referred to as the A.M.A.).
For the most part the record in this case was established by reading into it voluminous depositions, which, together *187 with the oral testimony and the numerous exhibits admitted into evidence, consumed six trial days, all of which took place in the presence of the court sitting without a jury.
A factual projection indicates that the plaintiff, Dr. Italo J. Falcone, a citizen of the United States, was born in Newark, New Jersey, on March 6, 1923, ever since which time he has been a resident of this State; and more particularly, since January 1, 1952 he has resided at 247 Livingston Avenue, New Brunswick, in this county. The facts further indicate that the plaintiff pursued undergraduate work at Rutgers University and Villanova College from September 1941 until September 1943, in an accelerated program equivalent to three years of undergraduate work. From September 1943 until September 1946 plaintiff was enrolled in an accelerated program at the Philadelphia College of Osteopathy in Philadelphia, Pennsylvania; and in 1946 the plaintiff received the degree of Doctor of Osteopathy (D.O.) from the Philadelphia College of Osteopathy. The Philadelphia College of Osteopathy was not at that time, nor is it today, a medical college approved by the A.M.A.
After receiving his D.O. degree, the plaintiff served a one-year internship and a three-year residency at the Detroit Osteopathic Hospital, which internship and residency likewise were not recognized by the A.M.A.
In 1950 the plaintiff presented his credentials from the Philadelphia College of Osteopathy and the Detroit Osteopathic Hospital to the New Jersey State Board of Medical Examiners, on the basis of which he was permitted to take the State Board medical examination, which examination, administered by the State Board of Medical Examiners, he was successful in passing. On November 8, 1950 this plaintiff received a license to practice medicine and surgery in the State of New Jersey. The State Board of Medical Examiners recognizes the degree of D.O. granted by the Philadelphia College of Osteopathy, as well as other osteopathic schools, as a prerequisite for admission to the physicians' examination. The license granted to this plaintiff is *188 the same as that granted to doctors holding the degree of Doctor of Medicine (M.D.), and entitles plaintiff to the very same rights and privileges. See N.J.S.A. 45:9-1 et seq.
Thereafter, and more particularly in 1951, the plaintiff attended the Medical School of the University of Milan, Italy, for a period of approximately seven months. The University of Milan gave the plaintiff academic credit for three years of medical school based on his courses of study at the Philadelphia College of Osteopathy, and awarded him the degree of Doctor of Medicine (M.D.) on or about November 12, 1951. The University of Milan, College of Medicine, is recognized as an approved medical school by the A.M.A.
After receiving his degree from the University of Milan, the plaintiff served a 16-month internship at St. Peter's Hospital in New Brunswick, New Jersey. The internship program at St. Peter's Hospital is approved by the A.M.A. Plaintiff also served a three- or four-month residency in surgery at the Jersey City Medical Center. The aforesaid residency was not one accredited by the American College of Surgeons or the A.M.A.
Since the latter part of 1951 or early 1952 plaintiff has maintained an office with his father, a licensed physician, for the practice of medicine and general surgery, at 247 Livingston Avenue, in New Brunswick, New Jersey. He is registered, according to law, with the County Clerk of Middlesex County. See R.S. 26:11-60.
In the latter part of 1953 the plaintiff was admitted to the defendant Middlesex County Medical Society as an associate member. The by-laws of the defendant society provide that a physician may not be an associate member for more than two consecutive years. At the time of his admission into associate membership by the defendant society plaintiff's application, admitted into evidence, did not indicate plaintiff's osteopathic education, nor his internship and residency at an osteopathic hospital. The application informed *189 the society that plaintiff had an M.D. degree from the University of Milan, and had completed an internship at St. Peter's Hospital in New Brunswick, New Jersey.
During the period of his associate membership in defendant society the plaintiff was a member of the medical staffs of the Middlesex General Hospital and St. Peter's Hospital, both in New Brunswick, and was permitted to admit his patients and to treat them therein. Both of the latter institutions require that a staff physician be a member of the Middlesex County Medical Society.
While the plaintiff was an associate member the defendant society learned that plaintiff's M.D. degree was based upon one academic year of study at the University of Milan and credit for three years of study at the Philadelphia College of Osteopathy, the latter not being a medical school approved by the defendant society.
By reason of the aforesaid facts the judicial medical ethics committee of the defendant society refused to recommend Dr. Falcone for active membership, and the general membership of the defendant society, at a regular meeting, also declined to admit the plaintiff to active membership. By letter dated November 29, 1956 the secretary of the defendant society informed the plaintiff that he was not eligible to membership in the defendant society, assigning as a reason therefor that the plaintiff had been "licensed to practice as a Doctor of Osteopathy and not as a Doctor of Medicine." The letter continued, "Inasmuch as your two years of Associate Membership in the County Society has expired, it was voted at the November 21, 1956, meeting to remove your name from its membership list as of that date."
After the defendant society deleted the plaintiff's name from its membership list, the Middlesex General Hospital and St. Peter's Hospital terminated the plaintiff's staff membership, and precluded him from admitting and treating his patients in these respective institutions.
*190 The plaintiff appealed from the decision of the defendant county society to the judicial council of the State Medical Society, and received a hearing from that body on January 27, 1957. The State Society's judicial council refused to interfere with the defendant county society's action. Thereupon the plaintiff appealed to the judicial council of the A.M.A., which body opined that it did not have jurisdiction to hear the plaintiff's appeal.
The testimony by various physicians, some of whom, hostile to this plaintiff, nevertheless, had the opportunity to observe the professional work of Dr. Falcone, indicates that the plaintiff is an ethical and capable physician. There is no evidence in the record that the plaintiff actually practiced osteopathy, but on the contrary, the testimony reveals that the plaintiff practiced the same system of medicine as that practiced by the members of the defendant county society.
The record likewise indicates that the defendant county society was, at the time of its rejection of Dr. Falcone's application for active membership, an unincorporated association, but that it has since become incorporated under the laws of the State of New Jersey. The defendant association consists of doctors of medicine licensed to practice medicine in New Jersey, who are accepted under the procedures provided for in the by-laws of the association.
The constitution of the defendant society sets forth the purposes of the organization as follows (art. II, sec. 1.)
"(a) To advance medical science;
(b) To elevate professional standards, safeguard the material interests of and promote friendly relations between members of the medical profession;
(c) To educate the public in prevention of disease and in the preservation of health;
(d) In general, to render this profession most capable of serving humanity."
The relevant provisions of the by-laws of the defendant society regarding membership are as follows:
*191 (ch. 1., sec. 1).
"A. Associate Members: Upon application, a physician, in accordance with Sect. 7 of this Chapter, (regulating the form of application), having graduated with the degree of Doctor of Medicine from a recognized medical school, and being licensed to practice medicine and surgery in New Jersey, and registered in his County according to law, shall become eligible for election to Associate Membership if his qualifications of professional training and medical ethics meet the requirements of the Committee on Medical Ethics. (See Sec. 3) * * *
B. Active Members: A physician who has been an Associate Member of this Society for two years, who has resided in New Jersey for at least the year preceding his election, and who meets the requirements of the Committee on Medical Ethics shall be eligible for election to Active Membership. * * *

(ch. 1., sec. 3). Election of Members.
The names and qualifications of all physicians recommended for membership by the Committee on Medical Ethics, shall be published in the bulletin previous to the regular meeting, at which they are to be presented for consideration by the general membership.
A majority vote of Active Members present at any such regular meeting shall constitute election to membership of a physician whose name has thus been published and proposed by the Committee on Medical Ethics. * * *

(ch. 5., sec. 5). Committee on Medical Ethics.
* * * The duties of this Committee shall be, in general, as follows:
* * * F. To investigate the qualifications of all applicants for membership in this Society and report its findings to the General Membership. It shall report favorably on all those applicants who have satisfied the Committee that they are complying with Rules of Medical Ethics as drawn up by the Committee, and meet the basic requirements for membership as specified in Chapter I of these By-Laws."
The record indicates that the judicial medical ethics committee applies a rule for membership requiring four years of study at a medical college approved by the A.M.A.
The Middlesex County Medical Society is a component part of the Medical Society of New Jersey, and is governed by the latter's laws. The State Society was founded July 23, 1766, and the Legislature of the State of New Jersey granted a charter to the State Medical Society in 1864. See R.S. 45:9-56 et seq. Every person who becomes a member of *192 the county medical society automatically becomes a member of the State Society. Each component society is the judge of the qualifications of its own members, subject to the right of approval of the State Society.
The State Society may revoke the charter of a component society where the component society has acted in conflict with the letter or spirit of the constitution and by-laws of the State Society.
The charter of 1864 grants to the State Society the authority to confer the degree of Doctor of Medicine, R.S. 45:9-57, although it does not appear in the record that the State Society has actually conferred such a degree.
The State Society also nominates for the consideration of the Governor of the State of New Jersey the names of doctors to serve as members of the State Board of Medical Examiners. N.J.S.A. 45:9-1.
The State Medical Society of New Jersey is a part of a federation of medical societies called the American Medical Association. As a constituent member of the A.M.A. the State Medical Society is bound to observe the Principles of Medical Ethics of the A.M.A.
Section 3 of the Principles of Medical Ethics of the A.M.A. provides:
"A physician should practice a method of healing founded on a scientific basis, and he should not voluntarily associate professionally with anyone who violates this principle."
It is noteworthy that the second affirmative defense asserted by the defendant society embraces the contention that the plaintiff is ineligible for membership for the reason that section 3 of the Principles of Medical Ethics has been construed to mean that any voluntary association by physicians with osteopaths is unethical, and since the license authorizing him to practice medicine and surgery in the State of New Jersey indicates that he received a D.O. degree, under their construction, he is unfit for association *193 with his confreres who also practice medicine and surgery in the State of New Jersey.
It will likewise be noted at this point that considerable testimony was taken with particular reference to the plaintiff's failure to have supplied all of the required information on the original application for associate membership, as well as his failure to have detailed information on the supplemental application for active membership. The court makes this comment for the reason that notwithstanding any right that the defendant society may have had by reason of this alleged failure on the part of the plaintiff, if any right existed, nevertheless, it elected to defend its position on the ground "that the Plaintiff has failed to comply with a Rule that requires four years of study in a Medical College approved by the A.M.A."
The immediate problem is a determination as to what extent the court may intervene with respect to the action taken by the defendant society barring this plaintiff from active membership.
Legal precedent indicates that the courts have been reluctant to interfere in the internal affairs of voluntary organizations. See 137 A.L.R. 311; 7 C.J.S. Associations § 23. But see, as to corporations, 34 Am. Jur. Mandamus § 98. It has been held that a court may not compel membership in a voluntary medical association. Medical Society of Mobile County v. Walker, 245 Ala. 135, 16 So.2d 321 (Sup. Ct. 1944); State ex rel. Hartigan v. Monongalia County Medical Society, 97 W. Va. 273, 124 S.E. 826 (Sup. Ct. App. 1924).
In the Walker case, supra, the court held that "The courts cannot compel the admission of an individual into such an association, and if his application is refused, he is entirely without legal remedy, no matter how arbitrary or unjust may be his exclusion." [245 Ala. 135, 16 So.2d 324.]
However, in cases involving exclusion from those medical societies which controlled the right to practice medicine, even the earlier cases granted writs of mandamus to compel *194 admission in appropriate cases. Hillery v. Pedic Society of State of New York, 189 App. Div. 766, 179 N.Y.S. 62 (1919) (chiropody); People ex rel. Bartlett v. The Medical Society of the County of Erie, 32 N.Y. 187 (Ct. App. 1865); Rex v. Askew et al., 4 Burr. 2186, 98 Eng. Rep. 139, 16 Eng. Rul. Cas. 760 (1768). Cf. Gregg v. Massachusetts Medical Society, 111 Mass. 185, 15 Am. Rep. 24 (Sup. Jud. Ct. 1872).
Despite the rigid rule imposed by some courts precluding judicial relief in exclusion cases, the courts have found various theories upon which to grant relief in an increasingly greater number of cases involving expulsions or suspensions from medical societies. See Annotation 20 A.L.R.2d 531. One theory developed by the courts is the contract theory. Medical Society of Mobile County v. Walker, 245 Ala. 135, 16 So.2d 321 (Sup. Ct. 1944); Smith v. Kern County Medical Association, 19 Cal.2d 263, 120 P.2d 874 (Sup. Ct. 1942).
The contract theory projects the view that the laws of an organization constitute a contract between a member and the organization. Therefore, the contract is enforceable in equity when the organization acts contrary to its own laws.
Other courts have demanded that an applicant for judicial relief have a civil or property right in an organization as a condition precedent to judicial intervention. Weyrens v. Scotts Bluff County Medical Society, 133 Neb. 814, 277 N.W. 378 (Sup. Ct. 1938); State ex rel. Hyde v. Jackson County Medical Society, 295 Mo. 144, 243 S.W. 341 (Sup. Ct. 1922); State ex rel. Waring v. Georgia Medical Society, 38 Ga. 608, 95 Am. Dec. 408 (Sup. Ct. 1869) (corporation). Only in the Hyde case, supra, does the court require a severable proprietary interest.
In other cases regarding expulsions from medical societies the courts have held that there is a judicial remedy without indulging in theoretical polemic. Bernstein v. Alameda-Contra Costa Medical Association, 139 Cal. App.2d 241, 293 P.2d 862 (D. Ct. App. 1956); 41 Minn. L. Rev. 212 *195 (1957); 5 Utah L. Rev. 270 (1956); Brown v. Harris County Medical Society et al., 194 S.W. 1179 (Tex. Civ. App. 1917); Reid v. Medical Society of Oneida County, 156 N.Y.S. 780 (Sup. Ct. 1915), affirmed 177 App. Div. 939, 163 N.Y.S. 1129 (1917); People ex rel. Wilson v. Medical Society of the County of Dutchess, 84 Hun. 448, 32 N.Y.S. 415 (Sup. Ct. 1895) (dictum). See also re expulsions from Medical Societies, Robinson v. Lull, 145 F. Supp. 134 (D.C.N.D. Ill. 1956); Irwin v. Lorio, 169 La. 1090, 126 So. 669 (Sup. Ct. 1930); Miller v. Hennepin County Medical Society, 124 Minn. 314, 144 N.W. 1091, 50 L.R.A., N.S., 579 (Sup. Ct. 1914).
In expulsion cases courts have reviewed the validity of the actions of the societies in the light of the laws of the particular organizations, and have also sought to determine whether certain procedural safeguards were provided. The Bernstein case, supra, required that the interpretation by the organization of its code of ethics be reasonable.
Legal writers have criticized the property and contract theories. 41 Minn. L. Rev. 212 (1957); 5 Utah L. Rev. 270 (1956); Comment, 65 Yale L.J. 369 (1956); Chafee, "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 993 (1930).
Professor Chafee recognized that there may be serious injuries without loss of any property right. The real interests of membership cannot be measured in terms of rights of property. As early as 1930, in his landmark article in the Harvard Law Review, supra, Professor Chafee saw the trend toward protection of interests of personality. He criticized the contract theory as artificial, and noted that both the contract and property theories frequently give rise to legal fictions. Neither theory looks to the substance of the injuries resulting from expulsion or loss of membership in an organization.
The prime difficulty in the formulation of a suitable rule for judicial review of exclusions or expulsions has arisen from the court's failure to distinguish between the various *196 types of organizations and the effect on public policy of a specific act of a particular organization. The Bernstein case, supra, embraces the modern view in that it determines that the rules of an organization may not be contrary to public policy, or contrary to the law of the land. See discussion in 5 Utah L. Rev. 270 (1956). The public policy requirements involving the preferment of charges against members was also noted in Comment, 8 Fordham L. Rev. 82, 102 (1939).
Recognizing that the real interests in an exclusion or an expulsion case are personal, rather than proprietary or contractual, the distinction which has arisen between expulsions and exclusions from voluntary organizations appears to be one of fiction, rather than of substance. A loss to one excluded from an organization may be as great, or greater, than a loss to one expelled or suspended therefrom. Chafee, "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 93, 1022 (1930).
A proper rule herein must be based on what the courts have actually done, rather than upon the theories upon which they have purported to base their decisions.
When the injury to the party expelled or excluded has been real enough, or has conflicted with some public policy, the courts have granted relief. Contrary to their theoretical discussions, the courts have, in fact, looked to the nature of the particular organization involved and to the degree of harm arising out of the particular act of the organization. 41 Minn. L. Rev. 212 (1957). Though the courts have tended to designate all private organizations as "voluntary" they have proceeded to distinguish among them in granting or denying judicial intervention. As was noted by legal writers in the Yale Law Journal,
"It is easy to understand why Courts are anxious to avoid the `dismal swamp' of ritual and dogma of social and religious associations and to encourage members to settle their disputes wholly within their own organizations. It is easy to understand why courts are solicitous of the rights of members of unions, trade and professional *197 associations: in terms of economic fact, membership in these organizations is not `voluntary,' but necessary for survival." Comment, 65 Yale L.J. 369 (1956).
It appears that New Jersey has no precedent concerning exclusions or expulsions from medical societies. This court is therefore called upon to apply to the instant case a rule, which, while giving due regard to what the courts have done in other jurisdictions, is consistent with the public policy of the State of New Jersey. This court is of the opinion that where an organization is in fact involuntary and/or is of such a nature that the court should intervene to protect the public, and where an exclusion results in a substantial injury to a plaintiff, the court will grant relief, providing that such exclusion was contrary to the organization's own laws, was without procedural safeguards, or the application of a particular law or laws of an organization was contrary to public policy. It follows that each case must stand upon its own facts.
Applying the above rule to the case at bar, the Court must determine (1) the nature of the defendant society; (2) whether or not the injury complained of herein is substantial; and if the findings in (1) and (2) justify judicial scrutiny of the defendant's action, the court must proceed to determine (3) whether the defendant society applied proper procedural safeguards, (4) whether the defendant society acted in accordance with its own laws; and, if so, (5) whether the defendant's laws, as applied here, were reasonable and consistent with public policy.
(1) A review of the entire record indicates to this court that the defendant Middlesex County Medical Society, combined with the other component parts of the State Medical Society of New Jersey and the American Medical Association, has virtual monopolistic control of the practice of medicine. The practical effect of such a monopoly is to prevent nonmembers of the society from practicing medicine in the overwhelming majority of hospitals in this *198 State. Society members control the staffs of all approved hospitals, and society members serve on the accrediting bodies for hospitals and medical schools. Eligibility for membership in the county medical society is a requirement for hospital staff membership promulgated by the joint commission on the accreditation of hospitals, which commission is composed of society members. Failure to observe that rule on the part of a hospital results in loss of accreditation. Withdrawal of accreditation from a hospital means that the hospital may not thereafter have an approved internship and residency program with which to attract young doctors. It also means that the hospital will be able to attract few, if any, society members, for the medical staff.
Although the A.M.A. and its constituent and component parts have been designated by many courts as voluntary organizations, other courts and legal writers have recognized the involuntary nature of these associations. Group Health Cooperative of Puget Sound v. King County Medical Society, 39 Wash.2d 586, 237 P.2d 737 (Sup. Ct 1952); Porter v. King County Medical Society, 186 Wash. 410, 58 P.2d 367 (Sup. Ct. 1952); Ewald v. Medical Society of New York County, 144 App. Div. 82, 128 N.Y.S. 886 (App. Div. 1911), 41 Minn. L. Rev. 212 (1957); 65 Yale L.J. 369 (1956); 63 Yale L.J. 938 (1954); Chafee, "The Internal Affairs of Associations Not For Profit," 43 Harv. L. Rev. 993 (1930). For anti-trust and monopoly actions brought against the A.M.A. and county medical societies, see United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1951); American Medical Ass'n v. U.S., 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1942); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8 Cir. 1959), certiorari denied 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); Riggall v. Washington County Medical Society, 249 F.2d 266 (8 Cir. 1957), certiorari denied 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958); Robinson v. Lull, 145 F. *199 Supp. 134 (D.C.N.D. Ill. 1956); Group Health Cooperative v. King County Medical Society, supra; Rockmore v. Fein, 198 N.Y. Misc. 1060, 99 N.Y.S.2d 409 (Sup. Ct. 1950).
Many authorities cited by the defendant society deal with fraternal and social organizations, emphasizing with great particularity that in organizations of such character the right of election and selection of membership has been reserved to them as a matter of law. It is well settled that in this latter class of organizations membership may be increased or decreased at will, without regard to standards, arbitrariness or otherwise, and without judicial interference.
The status of the defendant society, however, must be distinguished, for the reason that the Middlesex County Medical Society is not a fraternal or social organization. As a practical matter, it is virtually an institution that controls the practice of medicine in the hospitals located within this county. Membership in the defendant society is essential for any doctor wishing to freely and fully pursue his profession in Middlesex County.
The defendant society is far more than a private organization; a fact that will readily be developed from its own genesis. The State of New Jersey has clothed the parent State Medical Society with the authority to grant the degree of Doctor of Medicine. R.S. 45:9-57. The State of New Jersey has also imposed the duty and privilege upon the parent State Medical Society to submit the names of three of its members, for the consideration of the Governor, one of whom is to be selected for appointment to the State Board of Medical Examiners, when a vacancy exists. N.J.S.A. 45:9-1.
The monopolistic control by the defendant society of the practice of medicine in the county necessarily carries with it certain public responsibilities. It may not escape these responsibilities by designating itself as a private, voluntary association.
*200 The court finds that the defendant society is an involuntary organization, clothed with such public responsibilities that its actions are subject to judicial scrutiny.
(2) The plaintiff, here, Dr. Falcone, has, in the opinion of the court, suffered substantial injury by virtue of his exclusion from the defendant society. The main injury suffered, in addition to the injury to his reputation incidental to removal from a professional organization, was the plaintiff's expulsion from the medical staffs of the Middlesex General Hospital and St. Peter's Hospital, with which institutions theretofore he enjoyed an active professional association. Furthermore, his removal from membership in the defendant society effectively excludes him from all accredited hospitals in the area, for the reason that all accredited hospitals require membership in the county medical society as a prerequisite to staff membership.
The testimony indicates that a physician bereft of county society membership is barred from admitting a patient to an accredited hospital, and is also prevented from a professional visitation of any patient in the institution.
The testimony adduced at the trial indicates that while a physician may conduct a successful office practice without staff membership in a hospital, he could not, of course, practice surgery, except very minor surgery, without hospital privileges. The record likewise indicates that the plaintiff here, during his active association with the accredited hospitals, based on his associate membership in the defendant society, was engaged in the surgical and obstetric fields. It would be avoiding an obvious fact to say that hospital privileges are not indispensable for a surgeon, obstetrician, and even important for a general practitioner. Can it be seriously contended by the defendant society that exclusion from membership therein, together with his resultant expulsion from the medical staffs of the hospitals, cannot be translated in economic loss?
(3) The plaintiff, here, does not complain that he was denied procedural safeguards provided for by the defendant *201 society. He availed himself of the opportunity and pursued his right to appeal to the judicial council of the State Medical Society and the judicial council of the A.M.A.
(4) The determination of the judicial medical ethics committee was, in fact, grounded on a rule inspired by the A.M.A. requiring four years of study in a medical school approved by the latter organization.
(5) The remaining question is whether the defendant society contravenes the public policy of the State by the imposition of a rule requiring four years of study at a medical college approved by the A.M.A.
The State Board of Medical Examiners has inspected and approved the Philadelphia College of Osteopathy, in which institution this plaintiff successfully completed his training. By virtue hereof, this plaintiff was eligible to take the examination given to all candidates for the privilege of the practice of medicine in this State, and successfully passed such examination; on the basis of which he was issued a license to practice medicine and surgery in New Jersey. The license issued this plaintiff bestowed upon him the same rights and privileges as those granted to Doctors of Medicine licensed by the State. Notwithstanding his certification by the State Board of Medical Examiners as an individual authorized to practice medicine and surgery in New Jersey, he is being precluded from the practice of his profession in hospitals approved by the A.M.A.
The defendant society, through its monopolistic organization, thus prevents the graduates of the Philadelphia College of Osteopathy from practicing medicine to the fullest extent, even though the State of New Jersey has granted that privilege. The defendant society, by virtue of its action, has thwarted the public policy of the State which grants licenses to practice medicine and surgery to graduates of the Philadelphia College of Osteopathy, who successfully complete the required examination.
The rule of the defendant society requiring four years of study in a medical college approved by the A.M.A., *202 as applied to Dr. Falcone, contravenes the public policy of the State. It is in the interest of the State that all physicians and surgeons be given the opportunity to prove their qualifications to a hospital without the necessity of first establishing membership in the defendant society as a basic qualification for an opportunity to display their talents as physicians. Here is a blatant illustration of the defendant society's creating itself as an intermediary between the licensed physician and a hospital; an effort we hold to be offensive to the public policy of this State.
It may be reasoned that if the defendant society is adamant in its desire to continue a policy, in effect, the maintenance of a monopolistic hold on the practice of medicine, it has no alternative except to admit all those doctors duly licensed by the State of New Jersey who meet reasonable requirements. A rule barring graduates of a school approved by the State Board of Medical Examiners is unreasonable.
The defendant society argues that membership in the society is no guarantee that the plaintiff would be granted hospital privileges.[1] This contention has been conceded by the plaintiff. However, the absolute control of so-called *203 accredited hospitals, the accreditation of which is in the hands of defendant society members, effectively bars any nonmember licensed physician and surgeon from access to hospital staff privileges.
The defendant society further argues that the hospitals, rather than the society, require that a staff physician be a member of the local society.  A review of the record herein *204 supports the view that the hospitals impose the society membership requirement, in order to remain accredited institutions. This subservience on the part of hospitals is necessary for their continued existence, for without the approval of the Joint Commission On Accreditation of Hospitals, which body is controlled by physicians, who must, of necessity, be members of a local medical society, accreditation would be withdrawn, and their ability to attract interns and residents would be seriously impaired. Here again, the court wishes to point out that whilst it is true that the hospitals promulgate the society membership requirement, substantively the record indicates that for their failure to abide by the wishes of the defendant society, the purpose for which the hospitals were created would be defeated.
For the purpose of further clarification of the issue, the court deems it expedient, in summary fashion, to appraise the status of the defendant County Society in relation to its parent association, the State Society, as well as its degree of consanguinity to the A.M.A.
The State Medical Society came into existence by an appropriate act of the Legislature. Thereafter, under and by virtue of the charter granted the State Society, there was presumably created in each of the several counties of this State a county medical society, which has been characterized as a component of the State Society. The A.M.A., on the other hand, is the national federation, and each of the state societies is designated as a constituent thereof. Membership in the county society automatically confers membership in the State Society. Dues are paid to the local society, the major portion of which is transferred to the State Society, based on a per capita assessment. Membership in the A.M.A. is optional. However, the record indicates that the national federation promulgated the code of ethics which has been universally adopted by the several state societies, binding upon each component, and equally binding upon each member.
*205 This format represents in capsule form the functioning organizations collectively responsible for the promulgation of the "Rule of Limitation" affecting this plaintiff.
I deem it pertinent at this time to advert to some of the testimony adduced by the defendant society.
Dr. Schaaf, a member of the State Board of Medical Examiners, and a physician of great distinction, was interrogated by the court as follows:
"Q. Now, Doctor, does the A.M.A. Society in any way dictate or control the State Medical Society as to who the members of the State Medical Society shall be?"
The witness answered, in part:
"A. The State Societies have By-Laws which may not be in conflict or at variance with the General Constitution and By-Laws of the A.M.A."
He subsequently testified as follows:
"A. In order for a State Medical Society to retain its association with the American Medical Association, which is a federated organization, they would have to conform in general terms to the By-laws of the A.M.A. and also to their Code of Ethics."
At another point in Dr. Schaaf's testimony the following questions were propounded and answers given thereto:
"Q. And you could lose your membership in the local Medical Society for a variety of reasons. Isn't that true? A. Well, it would have to be some very specific misbehavior.
Q. How about non-payment of dues? A. Well, they are automatically dropped for that.
Q. So, Doctor, you, with 40 or 44 years' experience as a surgeon, couldn't operate on me for the simplest operation that you might prescribe for me in the Presbyterian Hospital because you didn't pay your dues in the Essex County Medical Society. Is that correct? A. If I were dropped from membership that would be correct.
Q. Regardless of your skill or ability, you couldn't get me admitted as a patient and I couldn't have you as my physician in the Presbyterian Hospital because you didn't pay your dues in the Society. Is that correct? A. Well, for the reason that I was dropped by the Society, regardless of reason."
*206 At another point in Dr. Schaaf's testimony the following was elicited:
"Q. (By the Court) The Osteopathic College teaches the same course as does the College of Medicine. A. Essentially they do."
Further interrogation by the court elicited the following from the witness:
"A. And the fact is that if these various Colleges of Medicine would discontinue the use of what is described as a cult name, if they would discontinue that, they might then be eligible for inspection by the Association of American Medical Colleges, and it is possible  I don't know that they would  but it is possible that some of them might meet the standards of the Association of American Medical Colleges. We rather think that one or two of them would.
Q. Just by the elimination of the name? A. Yes. As a concrete example of that, the Hahnemann Hospital in Philadelphia was a Homeopathic School. It was never approved until about 1938, when it abandoned the Homeopathic designation. It is still the Hahnemann because the name itself does not necessarily reflect a cult. In New York the Homeopathic College of Medicine and Flower Hospital became the New York College of Medicine. They dropped the designation of what was considered a cult. Now those two schools have been approved by the American Association of Medical Colleges. Eventually I could see the same thing could happen with respect to the Osteopathic Schools.
Q. Is that your feeling with respect to the Philadelphia College of Osteopathy, that if they dropped the name `Osteopathy' they would be qualified from the standpoint of your Board? A. You would have to modify that a little bit. They are now qualified by the Board."
Reference to this testimony is made for the sole purpose of revealing the control exercised by the defendant society, its parent, the State Society, and the other interlocking associated groups.
In our enlightened age, could anyone doubt that if the limitation here imposed, namely, that a duly licensed physician and surgeon would be denied the right to practice of our statute law, that the same would not be stricken medicine in a hospital unless he was a member of the defendant county society, were to be incorporated as part *207 as being unconstitutional and a denial of equal protection under the law?
Again it will be noted, the defendant society contends that, in the interest of public health and welfare, the standard it has adopted for membership in the defendant society, translated in the rule being applied to this plaintiff, requiring four years of study in a medical school approved by the A.M.A., is a necessary prerequisite in the public interest. However, the defendant society has lost sight of the fact that the plaintiff, here, has been admitted to the practice of medicine and surgery in the State of New Jersey, and by virtue of such licensure is entitled to practice medicine and surgery to the same extent as every other licensed physician in this State.
Notwithstanding the aforesaid, this plaintiff is, nevertheless, being denied admission in the defendant society, with consequences to him more fully set forth in the complaint under review.
It has been aptly stated by Mr. Justice Francis, in an unrelated matter, "that practically all Judges are Chancellors, and cannot fail to be influenced by any equitable doctrines that are available."
The State of New Jersey has determined that it is in the public interest that graduates of the Philadelphia College of Osteopathy who successfully pass the State Board examination be admitted to the practice of medicine and surgery in this State. The State of New Jersey is the appropriate authority for the declaration of public policy in relation to this field, and the same may not lawfully be exercised by any independent agency.
For the reasons herein assigned, the court declares the action taken by the defendant, Middlesex County Medical Society in excluding the plaintiff, Dr. Italo J. Falcone, from active membership, void and of no effect.
The court will order the defendant society to admit the plaintiff to full membership.
An appropriate order conforming with this opinion may be presented.
NOTES
[1] For cases concerning staff membership in public hospitals see Hayman v. City of Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1926); Jacobs v. Martin, 20 N.J. Super. 531 (Ch. Div. 1952); Wyatt v. Tahoe Forest Hospital District, 174 Cal. App.2d 709, 345 P.2d 93 (D. Ct. App. 1959); Munroe v. Wall, 66 N.M. 15, 340 P.2d 1069 (Sup. Ct. 1959); Dayan v. Wood River Township Hospital, 18 Ill. App.2d 263, 152 N.E.2d 205 (App. Ct. 1958); Dade County v. Trombly, 102 So.2d 394 (Fla. D. Ct. App. 1958); Duson v. Poage, 318 S.W.2d 89 (Tex. Civ. App. 1958); Ware v. Benedikt, 225 Ark. 185, 280 S.W.2d 234 (Sup. Ct. 1955); Alpert v. Board of Governors, 286 App. Div. 542, 145 N.Y.S.2d 534 (1955); Albert v. Board of Trustees, 341 Mich. 344, 67 N.W.2d 244 (Sup. Ct. 1954); Board of Trustees v. Pratt, 72 Wyo. 120, 262 P.2d 682 (Sup. Ct. 1953); Stribling v. Jolley, 241 Mo. App. 1123, 253 S.W.2d 519 (Ct. App. 1952); Findlay v. Board of Supervisors, 72 Ariz. 58, 230 P.2d 526, 24 A.L.R.2d 841 (Sup. Ct. 1951); Hamilton County Hospital v. Andrews, 81 N.E.2d 699 (Ind. App. 1948); Bryant v. City of Lakeland, 158 Fla. 151, 28 So.2d 106 (Sup. Ct. 1947); Green v. City of Petersburg, 154 Fla. 339, 17 So.2d 517 (Sup. Ct. 1944); Selden v. City of Sterling, 316 Ill. App. 455, 45 N.E.2d 329 (App. Ct. 1942); Richardson v. City of Miami, 144 Fla. 294, 198 So. 51 (Sup. Ct. 1940); Newton v. Board of Commissioners, 86 Colo. 446, 282 P. 1068 (Sup. Ct. 1929); Henderson v. City of Knoxville, 157 Tenn. 477, 9 S.W.2d 697, 60 A.L.R. 652 (Sup. Ct. 1928).

For cases concerning staff membership in private hospitals see Joseph v. Passaic Hospital Association, 26 N.J. 557 (1958); Berberian v. Lancaster Osteopathic Hospital Association, Inc., 395 Pa. 257, 149 A.2d 456 (Sup. Ct. 1959); Manczur v. Southside Hospital, 16 N.Y. Misc. 989, 183 N.Y.S.2d 960 (Sup. Ct. 1959); Edson v. The Griffin Hospital, 21 Conn. Sup. 55, 144 A.2d 341 (Super. Ct. 1958); Akopiantz v. Board of County Commissioners, 65 N.M. 125, 333 P.2d 611 (Sup. Ct. 1958); Glass v. Doctors Hospital, 213 Md. 44, 131 A.2d 254 (Ct. App. 1957); West Coast Hospital Association v. Hoare, 64 So.2d 293 (Fla. Sup. Ct. 1953); Natale v. Sister of Mercy, 243 Iowa 582, 52 N.W.2d 701 (Sup. Ct. 1952); Levin v. Sinai Hospital, 186 Md. 174, 46 A.2d 298 (Ct. App. 1946); Hughes v. Good Samaritan Hospital, 289 Ky. 123, 158 S.W.2d 159 (Ct. App. 1942); Loewinthan v. Beth David Hospital, 9 N.Y.S.2d 367 (Sup. Ct. 1938); Strauss v. Marlboro County General Hospital, 185 S.C. 425, 194 S.E. 65 (Sup. Ct. 1937); Van Campen v. Olean General Hospital, 210 App. Div. 204, 205 N.Y.S. 554 (1924), affirmed 239 N.Y. 615, 147 N.E. 219 (Ct. App. 1925); Stevens v. Emergency Hospital of Easton, Inc., 142 Md. 526, 121 A. 475 (Ct. App. 1923); State ex rel. Wolf v. LaCrosse Lutheran Hospital Association, 181 Wis. 33, 193 N.W. 994 (Sup. Ct. 1923); Harris v. Thomas, 217 S.W. 1068 (Tex. Civ. App. 1920), see Annotation 13 BRC 522, 523; People ex rel. Replogle v. Julia F. Burnham Hospital, 71 Ill. App. 246 (1896).
See also re staff membership in hospitals, Annotation, 24 A.L.R.2d 850; Annotation, 60 A.L.R. 656; Perr, "Hospital Privileges Revisited," 9 Clev.-Mar. L. Rev. 137 (1960); Mack, "Physicians Use of Hospital Facilities: Right or Privilege?" 8 Clev.-Mar. L. Rev. 437 (1959); 31 Ky. L.J. 197 (1943); 8 Tenn. L. Rev. 58 (1929).